706 P.2d 862
**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Donald Ray GARDNER,
Defendant-Appellant.**

**No. 7997.**

Court of Appeals of New Mexico.

Aug. 8, 1985.

Certiorari Denied Sept. 10, 1985.

Paul Bardacke, Atty. Gen., Michael Dickman, John McKenzie, Asst. Attys. Gen., Santa Fe, for plaintiff-appellee.

Joseph William Reichert, Albuquerque, for defendant-appellant.

## OPINION

DONNELLY, Chief Judge.

Defendant, Donald Ray Gardner, appeals from convictions on five felony charges: one count of fraudulent sale or offer of securities; one count of conspiracy to commit fraud; one count of criminal solicitation; and two counts of criminal fraud over $2,500.

Two issues are raised on appeal: (1) error in denial of mistrial; and (2) error in denial of directed verdict. Other issues listed in the docketing statement but not briefed by defendant on appeal are deemed abandoned. *State v. Doe,* 101 N.M. 363, 683 P.2d 45 (Ct.App.1983), *cert. denied,* 101 N.M. 276, 682 P.2d 61 (1984). We affirm.

### FACTS

Defendant was employed as a sales manager by Ruidoso Condo Share Vacation Club (RCSVC), a New Mexico corporation, to sell time-share units in a condominium project in Ruidoso. The time-share project was initiated by co-defendant, Jim Vincent, who had obtained financial backing from his father-in-law, Dr. James Monahan, and Dr. Thomas Aspell. Monahan and Aspell formed a limited partnership called Sierra Santa Development, Ltd.

Defendant was charged by grand jury indictment with securities fraud, failure to register securities, fraud over $2,500, embezzlement, solicitation, conspiracy, tampering with evidence, and attempted fraud.

Co-defendants Jim Vincent, Pamela Vincent, and Dean Shade, were also charged. Defendant's trial was severed from the remaining defendants.

Following the submission of the case to the jury, verdicts were returned acquitting defendant of Count 1 (offer or sale of unregistered securities), and Count 14 (attempt to commit fraud in excess of $2,500). Defendant was convicted of Count 3 (fraudulent practices in connection with the offer or sale of securities), Count 5 (conspiracy to commit fraud), Count 7 (criminal solicitation), and Counts 11 and 12 (fraud over $2,500).

After defendant's convictions, a supplemental criminal information was filed charging him as an habitual offender and alleging that he had previously been convicted of a felony consisting of securities fraud in the Federal District Court of Louisiana in 1978. Defendant admitted the allegations contained in the supplemental information.

## I. DENIAL OF MISTRIAL

During jury selection, the court asked members of the prospective jury panel whether any of them were acquainted with defendant. One of the panel members, Wilma Sandoval, stated that she had read newspaper articles about the case. Later, during further voir dire examination by the trial court, the panel was asked whether there "was anything to lead you to believe you could not sit fairly and impartially in this cause." Wilma Sandoval responded that five or six years ago defendant had attempted to purchase a cash register from her. Sandoval stated that defendant wanted to pay for the cash register "in two or three different payments ... [but] it was a cash only deal, and he came in with all these grandiose ideas, and I didn't trust him then, and I told my boss I would not sell it to him except for cash."

Defendant contends that the comments of Wilma Sandoval, concerning her prior contact with defendant, voiced during voir dire, were heard by other prospective jury members, conveyed a prejudicial impression of defendant, and served to deprive him of a fair trial. Defendant also asserts that Sandoval's remarks constituted testimony concerning defendant's character and that he had no opportunity to cross-examine Sandoval, resulting in a denial of defendant's constitutional right of confrontation.

Following the remark by Wilma Sandoval, defendant moved for a mistrial. The motion was denied by the trial court; however, the court offered to allow defense counsel to question Sandoval further on voir dire. Defendant declined to do so. Immediately thereafter, the court met with counsel and defendant in chambers and allowed counsel to exercise challenges to prospective jurors. At this time, the trial judge indicated that he was willing to ask members of the jury whether Sandoval's remarks had served to prejudice them against defendant. The court offered to question the prospective jurors either individually or as a panel. Defense counsel indicated that he did not feel this was necessary. Defense counsel later responded that he had not followed up with further questions at this time because he had not wanted to increase the potential risk of prejudicing the jury further. Sandoval was then stricken for cause.

Thereafter, a jury was selected including an alternate. After the jury was sworn, one juror, David Anderson, called Judge Doughty at home that evening. Anderson told the judge that after being selected as a juror he had reflected on it further and felt that he could not sit as a juror because his business partner was leaving town and because he had prior plans to go with his family to Mexico. The following morning the trial judge advised counsel for each of the parties about the phone conversation and, in the presence of counsel and defendant, summoned Anderson into chambers, where the juror was questioned further. Anderson stated that he was biased against defendant, based upon things that he had heard several months previously. When Anderson was asked why he had not disclosed this information during voir dire of the prospective jury panel, he stated,

"Well, I didn't want to do what that girl did yesterday by standing up and saying something about the man and swaying everybody to that effect." We assume, but do not decide, that Anderson was referring to Wilma Sandoval. Following further questioning of the juror in chambers, Anderson was excused from the jury panel and an alternate juror took his place.

■ The decision of whether to grant a mistrial rests within the sound discretion of the trial court and is reviewable only for an abuse of discretion. *State v. Simonson*, 100 N.M. 297, 669 P.2d 1092 (1983); *State v. Perrin*, 93 N.M. 73, 596 P.2d 516 (1979).

■ The denial of the mistrial was not error in the present case. The response of Wilma Sandoval to the questions posed by the court on voir dire was unexpected and unsolicited. The trial court promptly offered to admonish the prospective jury panel to disregard the remark. Sandoval's statement was susceptible to being cured by an admonition or cautionary instruction to the jury. As observed in *State v. Vialpando*, 93 N.M. 289, 297, 599 P.2d 1086 (Ct.App.), *cert. denied*, 93 N.M. 172, 598 P.2d 215 (1979), appellate courts in New Mexico have "frequently held that a prompt admonition from the court to the jury to disregard and not consider inadmissible evidence sufficiently cures any prejudicial effect which otherwise might result." (Citations omitted.) The court in *Vialpando* further stated:

> [T]his court has ruled that an offer to admonish, even though declined, is sufficient to support denial of a motion for mistrial. *State v. Carlton*, 83 N.M. 644, 495 P.2d 1091 (Ct.App.1972).... The trial court would be placed in the intolerable position of never being able to cure unwanted and spontaneous errors in testimony if we held that defendant could control the trial's progress by refusing to permit a possibly-curative admonition and yet rely on its absence to assert error.

*Id.*

In *State v. Verdugo*, 78 N.M. 762, 438 P.2d 172 (Ct.App.1968), this court considered a case factually similar to the present case. In *Verdugo*, during jury selection and in the presence of the entire panel of prospective jurors, five prospective jurors indicated that a reference to defendant's name had come up in another trial. One prospective juror mentioned that she thought that the other trial involved marijuana. The defendant in *Verdugo* was charged with acts involving heroin. None of the five prospective jurors who recalled mention of defendant's name in another trial was chosen to serve on the jury. Defendant moved for a mistrial, claiming that the remarks had prejudiced the entire jury panel. The trial court denied the motion. The denial of mistrial was upheld on appeal and the court noted:

> All prospective jurors were advised that they were to weigh the evidence fairly and impartially and decide the case in the light of the evidence and the instructions of the court. By their responses on voir dire the jurors selected indicated they would do so.
>
> ... Nothing in the record indicates the jurors selected were influenced by these answers or were other than impartial in reaching their verdict.
>
> It was neither manifest error nor an abuse of discretion to select a jury from persons who heard the answers of the five excused panel members.

*Id.* 78 N.M. at 763, 438 P.2d 172 (citations omitted).

■ Defendant also asserts he was deprived of a fair trial because he was denied the right to confront Sandoval, whose statements amounted to testimony against him. The issue is the denial of a fair trial during jury selection. The remark of a prospective juror during voir dire is not trial testimony; thus, the right to confront witnesses at trial is not involved. To the extent there is a right to confront prospective jurors, there was a waiver. Defendant was offered the opportunity to question Sandoval, and declined the offer.

We have reviewed the record and the cases relied upon by defendant and we find

no abuse of discretion on the part of the trial court in denying the motion for mistrial. Each of the jurors empaneled took an oath to fairly decide the case according to the law and evidence submitted. Additionally, each juror was initially instructed by the court that they exercise their judgment as jurors "without regard to any biases or prejudices that you may have." NMSA 1978, UJI Crim. 1.00 (Cum.Supp. 1984). Further, the jury returned verdicts acquitting defendant of two charges; this evidences the fact that the jury members conscientiously considered each charge against defendant and acted impartially. *E.g., State v. McGill,* 89 N.M. 631, 556 P.2d 39 (Ct.App.1976); *State v. Sero,* 82 N.M. 17, 474 P.2d 503 (Ct.App.1970).

## II. DENIAL OF MOTION TO DISMISS

At the close of the state's case-in-chief, defendant moved to dismiss all of the counts against him. Defendant urged that no evidence was introduced at trial to show that he knew that any statements by him, or by others under his authority, were false and that the state failed to establish any detrimental reliance upon false statements by defendant to any RCSVC's customers. The trial court denied defendant's motion to dismiss.

Defendant contends that the trial court's denial of his motion for directed verdict at the close of the state's case-in-chief was error because the state failed to offer evidence of any fraudulent intent to commit any of the crimes for which he was convicted. Defendant does not contest the propriety of the jury instructions given by the court.

The jury found defendant guilty of Count 3 (fraudulent practices in connection with the offer or sale of securities), Count 5 (conspiracy to commit fraud), Count 7 (criminal solicitation), and Count 11 and Count 12 (fraud over $2,500).

Each of the offenses of which defendant was convicted required an intent. The instructions given by the court specifically recited the requisite intent for each offense. In each offense the intent involved fraudulent conduct. *Compare State v. Shafer,* 102 N.M. 629, 698 P.2d 902 (Ct. App.), *cert. denied,* 102 N.M. 613, 698 P.2d 886 (1985).

Intent is an essential element of the crime of fraud. *State v. Ortiz,* 90 N.M. 319, 563 P.2d 113 (Ct.App.1977). Furthermore, criminal intent may be proved by direct or circumstantial evidence. *State v. Thoreen,* 91 N.M. 624, 578 P.2d 325 (Ct. App.), *cert. denied,* 91 N.M. 610, 577 P.2d 1256 (1978); *State v. Elam,* 86 N.M. 595, 526 P.2d 189 (Ct.App.), *cert. denied,* 86 N.M. 593, 526 P.2d 187 (1974). Fraudulent intent may be proven by reasonable inferences drawn from a defendant's statements and conduct. *State v. Lankford,* 92 N.M. 1, 582 P.2d 378 (1978); *State v. Martinez,* 95 N.M. 795, 626 P.2d 1292 (Ct.App.1979); *State v. Ortiz.* Here, the evidence clearly indicates that defendant made untrue statements to prospective customers in the sale or attempted sale of time-share units.

Flo Snow, a former salesperson for RCSVC, testified concerning sales techniques used by personnel of RCSVC. Snow's testimony indicated that defendant actively participated in deceptive sales pitch practices made to prospective customers. These practices were characterized as "Hollywood," defined to be "make believe." Defendant conveyed the impression that other people had purchased a time-share when no such actual sale had been made. Such an impression was given by blowing a horn in the sales office when a sale of a time-share was allegedly finalized. Snow testified the horn would blow even when no sale had been made.

Defendant was the sales manager for RCSVC and supervised its day-to-day business and the training of its sales personnel. Snow testified that defendant trained sales representatives to misrepresent closing costs to purchasers. Additionally, Snow stated that after a prospective customer showed a serious interest, defendant would take over and try to close the sale. Snow stated that if a buyer thought a price was too high, defendant would pretend to make

a phone call to an office in Houston. The Houston office was supposed to be a central office for a large organization and the Ruidoso office a part of that operation. Snow testified that defendant would falsely advise the prospective purchaser that he had obtained information from the office in Houston that another buyer of a time-share interest had traded it in and that it was now available at a reduced price.

Snow also testified that she had been instructed by defendant to inform prospective purchasers that the time-share condominium units had twenty-four hour security. This was untrue. Snow also stated that defendant instructed her not to tell purchasers that the $60 fee represented to purchasers to be closing costs actually was the first year's exchange fee in the event a purchaser wanted to exchange time in Ruidoso for use of a time-share elsewhere.

Another employee of RCSVC, Ed Leonard, corroborated Snow's testimony about defendant's involvement in misleading and false sales pitches. Leonard testified that when he began working with the company, defendant would take over the sale prospect when a sale appeared likely to materialize. Leonard stated that defendant customarily made representations to prospective buyers about nonexistent "trade-ins" of condominiums based on alleged information received from a nonexistent Houston main office of RCSVC.

Several witnesses who purchased RCSVC time-shares testified that they were offered trade-ins on condominium units that sales representatives stated were available based on purported information recently received from the central office in Houston. Grant Stevens testified that when he indicated to a RCSVC sales agent that he wanted a two-bedroom unit rather than a three-bedroom unit, defendant informed Stevens that he was in luck because a doctor who had bought two time-shares was getting a divorce and no longer wanted his time-shares. Defendant indicated that he could sell at least one, or possibly both, of the time-shares, to Ste-

vens for the price the doctor had paid; this information was false.

William Winder testified that he told a sales agent that $4,950 was too much for a time-share and the agent then stated he was authorized to sell him a unit for $3,000, because a prior purchaser had traded in her time-share for one in a larger unit. When the witness indicated that he wanted to think about it, defendant informed him that the $3,000 price was available that day only, take it or leave it. Winder testified that he purchased a time-share because he was informed both by a sales representative and defendant that he would receive free use of Sierra Swim Club and a golf club during his week of the time-share condominium. These statements were untrue.

Another witness, Susan LaPierre, testified that during negotiations with defendant regarding the purchase of a time-share, he told her that he had called the main office and had learned that a time-share had been traded in by someone who wanted to purchase the use of a larger unit. LaPierre also stated that defendant informed her that she could rent out a week of her time-share for $2,000. These statements of defendant to LaPierre were untrue.

Andrew Paschall testified that defendant told him that if he purchased a time-share he would also receive membership in the Sierra Swim and Racquet Club or comparable facilities without extra cost. Paschall discovered that this statement was not true.

George LeBow testified that defendant advised him that gambling would soon be a reality at the Inn of the Mountain Gods in Ruidoso. Defendant also told LeBow that he owned a time-share unit at RCSVC. Each of these statements by defendant was untrue.

■ (a) The above testimony constitutes sufficient evidence upon which the jury could properly conclude that defendant possessed the requisite intent to commit the offense of engaging in fraudulent practices in connection with the sale of securities

contrary to NMSA 1978, Sections 58–13–39(A) and –43 (Repl.Pamp.1984), as charged in Count 3 of the indictment.

■ (b) Count 5 charged defendant with conspiracy and charged that defendant combined with Jim Vincent, Pamela Vincent, and Dean Shade or another, for the purpose of committing fraud over $100, or alternatively, conspiring to commit securities fraud or sale of unregistered securities, contrary to NMSA 1978, Sections 30–28–2 (Repl.Pamp.1984), 30–16–6 (Repl. Pamp.1984), 58–13–39(A), 58–13–4 and 58–13–43.

Defendant asserts that proof of his criminal intent to commit the offense charged was insufficient to support his conviction of Count 5. Our review of the portion of the evidence recited above and the other evidence in the record shows that there was sufficient proof to establish the requisite intent to commit the offense of fraudulent practices with regard to the sale of or offer to sell securities as charged in Count 5.

■ (c) Count 7 of the indictment charged defendant with criminal solicitation to commit fraud of over $100, or in the alternative, securities fraud or sale of unregistered securities contrary to NMSA 1978, Sections 30–28–3 (Repl.Pamp.1984), 30–16–6, 58–13–4, 58–13–39(A) and 58–13–43. Again, the evidence detailed above is sufficient to support the jury verdict and to establish the requisite intent for the offense charged in Count 7. *See State v. McCall*, 101 N.M. 616, 686 P.2d 958 (Ct. App.1983).

■ (d) Count 11 charged defendant with obtaining property over $2,500 from William E. and Pamela D. Thompson, by fraudulent conduct contrary to Section 30–16–6. William Thompson testified that when he was discussing the possible purchase of a time-share unit, he advised RCSVC representatives that he would not purchase a time-share unit unless memberships in a racquet and golf club were included in the sales price. Thompson signed the purchase contract when defendant agreed to such terms. Thompson testified

that defendant told him that gambling would soon be underway at the Inn of the Mountain Gods in Ruidoso and that property values would appreciate due to this fact. Thompson also testified that defendant told him that RCSVC owned all of the units at the Peppertree location and that the company had plans to expand to three times its present size. The evidence indicates these statements were untrue.

Thompson also stated he gave defendant a check and asked him to hold it without cashing it until Thompson notified him when to cash it. Defendant cashed the check anyway, later contending it was a mistake. Despite defendant's explanation that Thompson's check was cashed without his authorization, the jury was free to draw reasonable inferences from the evidence, and could reasonably have believed that the check was intentionally cashed. *See State v. Lankford.*

Further, evidence was presented that Thompson was shown directories of time-share condominiums located throughout the country. Thompson testified that defendant explained that RCSVC was affiliated with Exchange Network, a time-share exchange organization, but that defendant falsely intimated that Thompson could readily work out exchanges of time-share units by use of other exchange companies and exchange the use of his time-share condominium with other owners from other parts of the United States.

Due to defendant's misrepresentations about the size of RCSVC, Thompson was led to believe that the company was a large organization and that it was financially stable. Thompson also said that defendant's representations that the swimming and racquet club and the golf club membership would be made terms of his time-share purchase contract, were important factors in persuading him to enter into the contract. The evidence, together with the inferences that may reasonably be drawn from it, was sufficient to establish proof of the element of reliance in the offense charged in Count 11 (fraudulent conduct). *See State v. Martinez; State v. McKay*, 79

N.M. 797, 450 P.2d 435 (Ct.App.1969). The evidence was also sufficient to establish the requisite intent. *See State v. McCallum,* 87 N.M. 459, 535 P.2d 1085 (Ct.App. 1975) (fraudulent intent may be proven by evidence of similar conduct). Further, the evidence supports an inference that defendant knew the representations he made were false. *See State v. Martinez.*

(e) Finally, defendant was charged in Count 12 with fraudulent conduct and defrauding Andrew and Virginia Paschall of property in excess of $2,500 contrary to Section 30–16–6. Andrew Paschall testified that he signed a contract to purchase a time-share from RCSVC in January 1983. He stated that the most important factor in his decision to purchase the time-share was his understanding that he would receive a membership in the swimming and racquetball club or comparable facilities. Paschall testified that he told defendant that otherwise he would not enter the contract. Paschall said that he had received verbal assurance that his membership card to the club would be in the mail soon after the signing of the contract. The membership card did not arrive and he began making inquiries. After each inquiry, he was assured that the card was on the way, but it never arrived. RCSVC finally offered Paschall a refund.

The record also indicates that defendant showed Paschall several time-share exchange directories and told him that his membership in RCSVC would enable him to work out a time-share exchange for any place listed in the directories. In fact, RCSVC had a time-share exchange agreement with only one organization (Exchange Network), which was limited in nature. Paschall testified that the representation concerning exchange possibilities interested him because he desired to exchange use of his time-share for time in Hawaii.

Hans Weulfing, a representative of Resort Condominiums International (RCI), testified that Exchange Network was affiliated with about 100 resorts while RCI was affiliated with about 500. Weulfing investigated the unauthorized use of copyright-ed RCI exchange directories by RCSVC. Weulfing said RCSVC had no affiliation with RCI and RCSVC was not authorized to use RCI material.

Evidence of defendant's fraudulent intent was supplied by his untruthful statements concerning the availability of the exchange value of the RSCVC memberships. The unauthorized use of the RCI directory and statements concerning the sports club memberships also constituted proof of fraudulent intent. *See State v. McCallum.* Here, as in Count 11, the victim specifically gave testimony as to his reliance upon defendant's false statements. Where the evidence supports a reasonable inference that defendant knew the representations he made to a purchaser were false, such is sufficient evidence of fraudulent intent. *State v. Martinez.* In this case the evidence supports the inference.

The judgment and sentences of defendant are affirmed.

IT IS SO ORDERED.

WOOD and MINZNER, JJ., concur.