799 P.2d 592

**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Robert CREWS, Scott Crews and Whitfield Bus Lines, Inc.,**
**Defendants–Appellants.**

**No. 10894.**

Court of Appeals of New Mexico.

Oct. 26, 1989.

Certiorari Denied Dec. 6, 1989.

Hal Stratton, Atty. Gen., Jane B. Wishner, Timothy Cornish, Asst. Attys. Gen., Santa Fe, for plaintiff-appellee.

John W. Boyd, Nancy Hollander, Freedman, Boyd & Daniels, P.A., Albuquerque, for defendants-appellants.

## OPINION

DONNELLY, Judge.

This matter is before us on rehearing. On rehearing, the previous opinion is withdrawn and the following is substituted.

Defendants appeal from convictions for conspiracy to commit fraud, fraud, and racketeering following a jury trial. Nine issues are raised as grounds for reversal: (1) validity of contractual provisions; (2) sufficiency of evidence; (3) claim of variance; (4) prosecutorial argument to the jury; (5) denial of due process; (6) invalidity of statement of facts; (7) claim of prosecutorial misconduct; (8) invalidity of charge of racketeering; and (9) claim of cumulative error. We affirm in part and reverse in part.

FACTS

The criminal charges against each of the defendants arose, in part, out of defendants' actions and conduct relating to monies received by them pursuant to school bus transportation agreements entered into by defendants with the Las Cruces School District No. 2 (District) and the State Board of Education. During the period from July 1980 through May 31, 1986, Whitfield Bus Lines, Inc. (Whitfield), was awarded a series of contracts by the District, and the State Board of Education, State Transportation Division (Division), to transport children. Defendant Robert Crews was the president of the Whitfield corporation and is the father of defendant Scott Crews. Scott Crews was the vice president of Whitfield and participated in its operation.

For several years prior to 1980, and during the years 1980 through 1986, the District and Whitfield entered into annual contracts to provide school transportation. The contracts were on forms prepared by the Division and were subject to its final approval. The State Board of Education, through the Division, oversees school bus transportation throughout New Mexico. Each of the transportation contracts for

the years in question specified that funds for payment of transportation services would be provided by the state and paid to the contractor through the District. The amounts payable to defendants under the contracts were determined by the contracts and a statewide transportation formula prepared by the Division, based in part on information supplied by defendants. Under the contracts, payments to Whitfield were subject to routine audit by the state. The contracts also provided that Whitfield was to maintain records of its transportation operations, including cost reports as required by NMSA 1978, Section 22–8–28 (Repl.1986).

Payments to Whitfield under the state transportation formula were computed on the basis of the length and type of each school bus route, the age, type and size of the bus used, and other related factors. Each year the payment formula was revised according to the availability of funds and the needs of the District. Under the contracts, defendants were to receive specific payments for services rendered in transporting children on each bus route. The amounts payable to a contractor under the contracts included, among other things, profit on operational revenue, the cost of fuel, drivers' salaries, special education aides' salaries, gross receipts tax, depreciation allowance, operation and maintenance allowance, and employee fringe benefits. The contracts entered into by defendants for the period 1980 through 1986 specified that payments to defendants would be based in part on the adjusted total of the transportation formula for the routes serviced by the contractor.

Following a state audit of payments made to defendants under the school bus transportation contracts and which included the period of 1982 through 1986, numerous financial discrepancies were found and defendants were subsequently indicted and charged with conspiracy to commit fraud, fraud, and racketeering. Defendants were alleged to have committed fraud by claiming that certain of the buses supplied by

them were gasoline operated and subject to a higher fuel allowance, when in fact they were diesel-powered and subject to a lower fuel allowance; falsifying the date of the buses' manufacture in order to qualify for a greater depreciation allowance; and misrepresenting that they were paying drivers the aggregate amount of money specified in the contracts and in accordance with the state formula. Defendants were also charged in separate counts for different contract years with having falsely misrepresented to the District and Division that they were entitled to receive in excess of $20,000 for each contract year intending to deceive or cheat the state and District concerning the cost of providing special education aides on buses transporting handicapped children. The state also alleged that because of the misrepresentations by defendants, they improperly obtained funds in excess of $20,000 for each contract year for special education aides.

Before trial the state voluntarily dismissed some of the fraud counts and by stipulation of both sides, the remaining counts of the indictment were renumbered.[1] Following a jury trial, defendants were acquitted of the counts which charged fraud in connection with the "depreciation allowance" of vehicles and each defendant was convicted of seven counts of fraud over $20,000, one count of fraud over $2,500, and one count each of conspiracy and racketeering.

I. VALIDITY OF CONTRACT PROVISIONS

Each defendant, including the corporation, was convicted of four counts of fraud over $20,000, contrary to NMSA 1978, Sections 30–16–6 and 30–1–13 (Repl.Pamp. 1984), for fraudulently misrepresenting that defendants were paying to their bus drivers the aggregate amount of monies provided for in the annual transportation contracts and generated for drivers' salaries by the Division's distribution formula for the school years 1982–83 through 1985–

1. As renumbered, counts 2 through 5 charged fraud in relation to the depreciation of buses, counts 6 through 9 charged fraud in relation to drivers' salaries, counts 10 through 13 charged fraud in relation to special education aides, and count 14 charged racketeering.

86. Defendants were charged both as principals or as accessories.

■ Defendants argue that during the applicable time periods there was no state regulation, statute, or other legal provision authorizing the contractual provisions contained in the transportation contracts requiring payment by them of the aggregate amount of monies provided in the contracts and which had been generated for drivers' salaries by the Division's distribution formula. Defendants contend that absent a valid statute, regulation, or other authority, they are not subject to criminal culpability and that the contract provisions regarding drivers' salaries are legally unenforceable.

Defendants assert that the contractual provisions in question were placed by the Division in all school bus transportation contracts because of language incorporated in the 1972 General Appropriations Act, 1972 N.M.Laws, Chapter 98. The pertinent language of that statute provided, "The state board of education shall promulgate and enforce regulations which will ensure that the total salaries paid to school bus drivers by a school bus contractor or school district shall be at least equal to the amount provided for that purpose under the distribution formula * * *." 1972 N.M.Laws, ch. 98, § 4, p. 698–9.

Since 1972, all contracts with school bus providers contained provisions stating that the contractor was obligated, through development of a salary schedule, to expend for drivers' salaries at least the aggregate amount of money generated for drivers' salaries by the Division's distribution formula. Although the phrasing of these provisions varied in part from 1982 to 1987, the substance of such contractual provisions was not materially changed.

Defendants contend that this contractual provision is void and that the challenged language contained in the 1972 General Appropriations Act violates Article IV, Section 16 of the New Mexico Constitution because the constitution limits what an appropriation act may properly contain. Defendants argue, among other things, that the 1972 Appropriations Act purported to require the State Board of Education to adopt regulations governing future appropriations of state funds expended for school bus transportation, that the act attempted to establish as a permanent policy a requirement that future years' appropriations be restricted regarding the use of drivers' salary funds, and that such provision is invalid. We do not agree. An equally reasonable interpretation of the contested provisions of the 1972 General Appropriations Act is that the language requiring the distribution of the entire drivers' salary aggregate was intended by the legislature to apply only to that fiscal year. The inclusion of this provision in each of the school bus transportation contracts for the ensuing years was not dependent for its enforceability upon the existence of a statutory provision or a state board of education regulation.

Even if we were to assume, arguendo, the merit of defendants' argument regarding the unconstitutionality of the 1972 Appropriations Act, an interpretation we do not determine to be meritorious, this would not require dismissal of the fraud charges against defendants. Defendants cite to three out-of-state cases where a contract provision was voided because it was based on an unconstitutional statute. *See State ex rel. State Highway Comm'n v. City of St. Louis,* 575 S.W.2d 712 (Mo.App.1978); *Hartford Ins. Group v. Town of North Hempstead,* 127 Misc.2d 72, 485 N.Y.S.2d 436 (N.Y.Sup.Ct.1984); *City of Cleveland v. Clements Bros. Constr. Co.,* 67 Ohio St. 197, 65 N.E. 885 (1902). We conclude that these cases are distinguishable from the facts of the instant case because they do not involve allegations of criminal conduct. Instead, they are cases involving defenses of civil breach of contract cases.

Under Section 30–16–6, the question of whether a specific contractual provision is based on a valid statute or regulation is irrelevant to the instant case. The proof necessary for conviction of the charges here does not depend on whether or not the contract provisions were based upon an unconstitutional statute. *See Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24

L.Ed.2d 264 (1969). As observed in *Bryson*, " 'a claim of unconstitutionality will not be heard to excuse a voluntary, deliberate and calculated course of fraud and deceit * * *. [The] prosecution [is] directed at [the] fraud. It is not an action to enforce the statute claimed to be unconstitutional.' " *Id.* at 68, 90 S.Ct. at 358 (quoting *Dennis v. United States*, 384 U.S. 855, 867, 86 S.Ct. 1840, 1847, 16 L.Ed.2d 973 (1966)).

In the instant case, the proof required for conviction under such statute is proof that defendants, by any words or conduct, made a promise they had no intention of keeping, with intent to deceive or cheat, to the District and the state, and thus defendants represented that they would expend for drivers' salaries at least the aggregate amount of money generated by the Division's distribution formula during the applicable contract period. The instructions that the court submitted were consistent with the instructions the supreme court has approved. *See* SCRA 1986, 14-1640. The prosecution here was directed at the alleged criminal fraud of each of the defendants rather than a civil action to enforce the contract. Under these circumstances, defendants' convictions for fraud were not invalid and we find their arguments without merit.

## II. SUFFICIENCY OF EVIDENCE

■ Defendants also argue that there was insufficient evidence to support their convictions of fraud with regard to nonpayment of drivers' or special education aides' salaries on each count of fraud in excess of $20,000. We disagree. In reviewing claims of insufficiency of evidence, an appellate court reviews the evidence in a light most favorable to support the verdict, resolving all conflicts and indulging all permissible inferences in favor of the verdict. *State v. Sutphin*, 107 N.M. 126, 753 P.2d 1314 (1988). Fraud may be established by direct or circumstantial evidence. *State v. Ross*, 104 N.M. 23, 715 P.2d 471 (Ct.App. 1986). *See also State v. Gardner*, 103 N.M. 320, 706 P.2d 862 (Ct.App.1985) (fraudulent intent may be proven by reasonable inferences drawn from a defendant's statements and conduct); *State v.*

*Brown*, 100 N.M. 726, 676 P.2d 253 (1984) (material facts can be proved by inference). Intent to defraud can reasonably be inferred from the actions of defendants in furnishing incorrect documentation to the District and state. *Cf. State v. Martinez*, 95 N.M. 795, 626 P.2d 1292 (Ct.App.1979). Defendants were required by law to submit periodic cost reports. § 22-8-28.

■ We have reviewed the evidence presented at trial and determine there was sufficient evidence to support defendants' convictions on each of the charges involved in this appeal. We reverse, however, on other grounds the conviction of Whitfield for racketeering.

The state presented evidence at trial indicating, among other things, that defendants received state funds in excess of $400,000 for bus drivers and special education aides over a four-year period. In addition, there was evidence indicating that defendants led the state and local school districts to believe that these funds were being paid to their bus drivers and special education aides in salaries and benefits, when the evidence indicated defendants did not pay such funds in full as represented. At trial, the state also introduced evidence that in each contract year covered by the indictment, the defendants had failed to pay out substantial portions of those funds in salaries or in benefits as promised or represented.

With respect to the drivers' salary aggregate, the jury was instructed that defendants promised to pay the aggregate in drivers' salaries but had no intention of doing so. With respect to the cost of special education aides, the jury was instructed that defendants misrepresented to the state that they had paid the total amount requested as costs in salaries to those aides. Although the state's theory with respect to the two categories differed, both theories were consistent with the uniform jury instruction for fraud. *See* R. 14-1640.

### A. Drivers' Salary Monies

Defendants Robert and Scott Crews did not testify at trial. The state called a

number of witnesses who gave testimony relating to the charges that defendants had obtained funds from the state and District by fraudulent conduct, practices, or representations, and that defendants had committed fraud by signing the contracts in question, with the intent not to perform the requirement that the drivers' salary monies be fully paid out.

Among the principal witnesses called by the state were Ron Jorgenson, a former school bus driver employed by defendants, Bill Loshbaugh, former director of School Bus Transportation, Isaac Martinez and George Carmignani, employees of the Division who conducted an audit of the records of defendants, and Glenda Newcomer, a bookkeeper for defendants.

Bill Loshbaugh testified that after receiving complaints from Ron Jorgenson questioning whether defendants were paying their bus drivers the proper amounts, he sent Isaac Martinez and George Carmignani to audit records of defendants and the District. Loshbaugh testified that the school bus transportation contracts entered into by defendants contained specific requirements during the years in question requiring that the school bus contractor shall expend for driver's salaries at least the aggregate amount of money generated for drivers' salaries by the Division's distribution formula.

Loshbaugh also testified that in addition to the contractual provision requiring that the aggregate amount allocated for drivers' salaries be paid out by defendants, the instructions issued by the Division for filling out annual school bus transportation reports directed that the full amount of the drivers' salaries aggregate was required to be paid out by school transportation contractors. Loshbaugh stated that after the audit was completed by his division of defendants' records for the school years 1982–83 through 1985–86, the audit showed for the three-year period there was a substantial difference between the aggregate amount of funds paid to defendants by the state and the amounts which had in fact been paid by defendants to their drivers.

Loshbaugh further testified that if he had known that defendants were not paying the aggregate amounts of monies as required by the contracts to their drivers, he would not have allowed the money for drivers' salaries and special education aides to be paid to defendants. He stated that after the audit was made known to defendants, he received a letter from Mike Paulowsky, an attorney for defendants, responding to the audit. Paulowsky's letter itemized other items which defendants argued should be considered as payments to drivers, including physical exams, training expenses, administrative costs, and drivers' incentives. He also stated that defendants contended these items should have been properly considered to have been included in the amounts paid by them to their drivers. Loshbaugh testified that defendants had been reimbursed for some of the amounts claimed as credits with other funds. Loshbaugh also testified that records required to be filed each year concerning defendants' costs and expenses were prepared by the defendants; that this information was used by the state and District to make payments to the defendants; and that the audit showed that defendants had failed to pay the total amount required under the contracts to their drivers.

Isaac Martinez, an accountant employed by the Division, testified that he reviewed and audited defendants' records and those of the local school district. He testified that his division customarily received reports from the school districts reporting how much money is necessary for school transportation and these reports were utilized as a basis for obtaining legislative appropriations and for making payments to individual school districts for school transportation. Martinez testified that funds paid to school bus contractors for drivers' salaries and for providing special education aides were not authorized to be used for other purposes and that Robert Crews had told him that he was aware of the requirement that the aggregate amount of drivers' salary money was required to be paid to the drivers, but that he thought it was an open item and could include other expendi-

tures made by defendants for training and other things.

State's exhibit no. 49, consisting of a memorandum from Scott Crews to school bus employees of defendants, was received into evidence. The memorandum stated in part that "[w]e are required, by law, to disburse the drivers, the total amount of the wage portion of the contracts that we operate for the School District." This statement raises an inference that defendants were aware that they were required to disburse the total amount of the wage portion of the contracts to the drivers. Evidence was presented indicating that defendant corporation was essentially a small, closely-held corporation managed and run by defendants and that Robert and Scott Crews closely participated in management of the corporation.

Martinez stated that Scott Crews also told him that defendants had paid out bonuses at the end of the year to make up the shortage in the drivers' salaries. The jury could reasonably determine from this evidence that defendants were aware of the obligation to pay out monies to their school bus drivers as part of the salary aggregate and that there was a shortage in the amounts of payments actually made by them to their drivers as salaries.

In sum, in respect to the amounts received by defendants in public funds and the amounts paid out by them, Martinez testified that the results of the audit indicated that:

(1) During the 1982–83 contract year defendants were paid by the state for drivers' salaries: $399,114.33
Defendants paid their drivers: $286,125.99
The total shortfall was: $122,988.34

(2) During the 1983–84 contract year defendants were paid by the state for drivers' salaries: $399,780.27
Defendants paid their drivers: $300,097.80
The total shortfall was: $ 99,682.47

(3) During the 1984–85 contract year defendants were paid by the state for drivers' salaries: $448,179.60
Defendants paid their drivers: $368,358.85
The total shortfall was: $ 79,820.75
The total shortfall for the three contract years was: $292,491.56

Martinez also testified that even if the credits claimed by defendants, amounting to approximately $64,053.60 were allowed, there still existed a shortfall of $228,437.96 between the amounts paid in state funds to defendants for drivers' salaries and the amounts in fact paid by defendants to their drivers. Martinez further stated the letter written by defendants' attorney on behalf of defendants and which undertook to respond to the audit, did not fully explain the financial discrepancies revealed by the audit.

Gene Sheward, the director of transportation for the District, also testified. Sheward stated that after receiving the audit report he was surprised to learn that defendants had not been paying the aggregate amount to their drivers. Sheward stated that he prepared the vehicle production reports for submission to the state and that these reports were used by the state for obtaining funding and making payments to the District and defendants. Sheward stated that while his office had information concerning the type of bus route, most of the other data contained in the reports was obtained from defendants. Sheward also prepared calculations and reports to send to the Division. Before he sent the reports to the Division he requested that defendants perform a separate calculation and check their figures against his for accuracy. Sheward related he obtained much of the information used in preparing the vehicle production reports from Scott Crews and that he relied upon the information provided to him by defendants. Sheward also stated that he received written instructions every year from the Division on how to complete the annual vehicle production reports and that he took copies of these instructions to Scott Crews. Sheward's testimony further indicated that defendants received copies of these instructions for each of the contract years from 1982 through 1985.

Glenda Newcomer, an employee of defendants, testified that she had served as their

bookkeeper during the period of 1982 through 1986, that it was Whitfield's practice that Scott Crews would prepare computer print-outs which contained the data for completing the vehicle production reports, and this information was then sent to Sheward. She stated that monies were then paid to defendants by the state and District based upon information submitted by defendants for inclusion in the vehicle production reports. She also testified that she made copies of cost reports to send to the District and that copies of these reports were given to Scott and Robert Crews before she sent them out. She stated that she had never been told by defendants prior to the audit that Whitfield was required to pay out at least the total aggregate amount of drivers' salaries generated by the school transportation formula to their drivers. Newcomer also testified that both she and Scott Crews prepared attachments to Paulowsky's letter responding to the audit report. Newcomer conceded that the amounts claimed by defendants indicated that a shortfall existed in the amounts paid by the defendants to their school bus drivers.

Paulowsky testified that he met with defendants and prepared a letter, State's Exhibit No. 18, replying to the audit report. He stated that it was the position of defendants that a number of other expenses could be charged off as amounts paid to drivers, including costs of training drivers and bus maintenance. He stated he did not prepare the calculations used in his letter of response and that this came from defendants. As shown by the attachments to Paulowsky's letter, the income received by defendants from school transportation contracts for 1982–83, 1983–84, and 1984–85, included:

| | |
|---|---|
| Drivers Base Wages | $1,189,725.02 |
| Approved Additions | 16,938.90 |
| Silver City Institute Increments | 37,485.00 |
| Total Wage Income per Contract: | $1,244,148.92 |
| Total Wages and Services Paid by Defendants: | $1,088,408.33 |
| Wage Shortfall: | $ 155,740.59 |

Paulowsky testified that defendants claimed $22,587.08 for additional credits. He indicated, however, that even if these amounts were accepted there would still remain a "total wage shortfall" of $133,153.51 between the amounts received by the defendants and the amounts they paid out to their drivers.

The evidence and testimony presented by the state provided substantial evidence from which the jury could reasonably find that defendants committed the fraudulent acts in question, by signing contracts for the contract years 1982 through 1985, representing they would pay out the amount of the drivers' salary aggregate, that the state and District relied on defendants' representations, and that the state and District continued to contract with defendants based on defendants' actions, when in fact the defendants were not making the payments as represented and did not intend to do so.

## B. Special Education Aides' Salaries

Defendants also challenge the sufficiency of the evidence to support their convictions for fraudulently obtaining funds from the state and District for special education aides. Defendants argue, among other things, that there was no regulation or statute requiring them to pay the entire amounts specified by the state for the cost of special education aides and that there is no evidence that any such requirement was ever communicated to them. Defendants also argue that there is nothing in the contracts or other legal authority that requires the costs of special educational aides be interpreted to be paid out to their aides as salaries and that when requests were made by them for money for payment of special education aides, the calculations for the aides' wage allowance should be construed so as to include credits against such costs, for payments made by them in the form of other benefits and gross receipts taxes.

Payments to defendants by the state and District for special education aides were

made in order to provide qualified personnel on school buses which transported children enrolled in special education programs. The evidence indicates that the District calculated how many aides were necessary and then submitted a request for the amount of money it needed in order to pay the cost of hiring aides for special education buses. In this case, defendants provided and paid the special education aides needed on their bus routes and sought payment by the state for these costs. The evidence at trial showed that certain of the drivers on special education routes had been qualified as special education aides and that defendants paid monies for special education aides out of the drivers' salary account. In addition, the evidence indicates that defendants submitted claims and received separate monies from the state for reimbursement of the costs incurred in furnishing special education aides.

The allegations of fraud with regard to special education aides arose not from a contractual obligation but from a pattern of practice regarding requests for money and defendants' failure to pay as indicated. At trial, the state presented a number of documentary exhibits and the testimony of numerous witnesses bearing upon the charges by the state that defendants had fraudulently misappropriated or had taken funds from the state for special education aides, and did not pay such amounts to their aides as represented.

Isaac Martinez testified that under the procedures followed by the state during the time periods in question, the amount of monies paid to defendants for special education aides were paid out for reimbursements for costs claimed by defendants. Martinez also testified that monies paid to defendants for special education aides were not authorized by the state to be kept by defendants or utilized by them for other purposes.

The testimony of Martinez showed that the audit of defendants revealed:

| | |
|---|---|
| In 1982–83 defendants received for special education aides (plus percent employee benefits): | $ 72,919.00, plus benefits |
| Wages paid by defendants: | $ 33,207.55 |
| Shortfall in payments: | $ 39,711.45 |
| In 1983–84 defendants received: | $ 74,830.00, plus benefits |
| Wages paid by defendants: | $ 33,207.55 |
| Shortfall in payments: | $ 41,622.45 |
| In 1984–86 defendants received: | $105,181.00, plus benefits |
| Wages paid by defendants | $ 42,137.30 |
| Shortfall in payments: | $ 63,043.70 |

Martinez also testified the total shortfall in payments by defendants to the aides during the applicable three-year school contract period amounted to $144,377.60, and that a large percentage of the monies received by them for payment for special aides was withheld and kept by them out of the amounts they received as reimbursement for costs for the aides. Martinez testified that the audit indicated defendants were improperly including the wages for special education aides in the drivers' salary reports. Similarly, George Carmignani, who assisted in the audit, testified in part that:

When we first were given the assignment to go down there and look at the records we were asked to investigate the drivers' salaries. As we started looking into the drivers' salaries we found that the [special education] aides' salaries * * * were also included in the same * * * monthly summary analysis for the regular drivers. So we had to collect both * * *. We could see right away that the hourly wage of what was produced by the formula and what [amounts

defendants] actually paid [to the aides] was less than what the formula generated * * *.

Gene Sheward testified that he submitted reports to the state based on information he obtained from Whitfield and that payment to defendants for special education aides was funded by the state as a result of reports he prepared and which were submitted to the Division. He stated that he received information about the costs for special education aides from Scott Crews. After receipt of the audit, Sheward stated that he was surprised to learn that defendants had not been paying the full amount provided by the state for special education aides. He testified that he had never checked defendants' records to see if they had been making these payments but had relied upon the information they provided to him.

The testimony of defendants' bookkeeper, Glenda Newcomer, also indicated that defendants requested money for costs of special education aides, but did not pay the full amounts received from the state for this purpose to the aides. Newcomer testified that between 1982 through 1986, it was Whitfield's practice that Scott Crews would prepare computer printouts containing the information to be included in the vehicle production reports and this data was submitted to Sheward.[2] The jury could properly infer from Newcomer's testimony that each of the defendants was aware that the amounts paid to them for the cost of special education aides were based upon information submitted by them to the District and state. The provisions of Section 22–8–28 also require each school bus contractor to submit a school bus cost report to the State Transportation director.

The state, through the testimony of Bill Loshbaugh, also presented evidence indicating that the monies paid by the state to the defendants for special education aides were intended to constitute payment to defendants for the actual salaries plus employee benefits that defendants represented they were paying to the special education aides, and that if he had been aware that defendants were not paying the amounts claimed by them for special education aides' he would not have allowed the money to be paid for this purpose to the defendants. Loshbaugh also testified that certain expenses claimed by defendants and which they had included in their claims of costs for school bus drivers and special education aides were shown to be invalid and duplicative of costs for which they had already been reimbursed.

In sum, the evidence presented by the state was such that the jury could reasonably determine that both the state and local school authorities believed that the money requested by defendants was being paid to the aides as salary and that defendants fraudulently furthered this belief. The record also indicates that substantial evidence existed upon which the jury could reasonably determine that each of the defendants, by words or conduct, misrepresented to the District and state that defendants were entitled to receive in excess of $20,000 for the cost of special education aides during each of the contract years in question, intending to deceive the District and state, and that because of these misrepresentations defendants obtained public monies in excess of $20,000.

Defendants were each charged with fraud either as principals or as accessories. The material facts necessary to support the criminal charges against the defendants were not required to be proved by direct evidence; it is sufficient if evidence exists from which the material facts can properly be inferred. *State v. Herrera*, 102 N.M. 254, 694 P.2d 510 (Ct.App.), *cert. denied*, 471 U.S. 1103, 105 S.Ct. 2332, 85 L.Ed.2d 848 (1985). Our review of the record indicates the existence of substantial evidence to support the jury's determination of fraud on the part of the defendants as alleged in the indictment.

C. Evidence of Conspiracy and Racketeering

■ Defendants also challenge the sufficiency of the evidence to support the jury

---

**2.** Isaac Martinez also stated that Newcomer told him that defendants had included in their driv-

ers' salary reports some of the wages which they had paid for special education aides.

verdicts convicting each defendant of one count of conspiracy contrary to Section 30–16–6 and NMSA 1978, Section 30–28–2 (Cum.Supp.1988). Our review of the record indicates the existence of substantial evidence to support the jury verdicts for conspiracy to commit fraud as to defendants Robert and Scott Crews, and the evidence was such that the jury could reasonably determine that defendants knowingly committed the offense of conspiracy to commit fraud upon the District and state in excess of $20,000. Proof of conspiracy may be established by either direct or circumstantial evidence. *State v. Armijo*, 90 N.M. 12, 558 P.2d 1151 (Ct.App.1976); *State v. Ross*, 86 N.M. 212, 521 P.2d 1161 (Ct.App.1974).

Defendants Robert and Scott Crews were each charged with having engaged in a pattern of racketeering consisting of committing "two (2) or more felonious acts of fraud" as charged in the indictment. The essential elements of racketeering as applied to the instant case are (1) the existence of an enterprise as defined in NMSA 1978, Section 30–42–3(C) (Repl.Pamp.1987); (2) that defendants were employed or associated with the enterprise; (3) that defendants participated in or conducted the affairs of the enterprise; (4) that defendants conducted or participated in the conduct of the affairs of the enterprise through a pattern of racketeering, i.e., through the commission of two or more crimes of fraud; and (5) that defendants engaged in at least two incidents of racketeering with the intent to commit a prohibited activity as described in NMSA 1978, Section 30–42–4 (Repl.Pamp.1987), and that at least one of the incidents of racketeering occurred within five years of a prior incident of racketeering. *See* §§ 30–42–4(C); 30–42–3.

■ Our review of the evidence also indicates that the record contains substantial evidence to uphold each element of the charge of racketeering and the jury verdict finding defendants Robert and Scott Crews guilty of racketeering contrary to Section 30–42–4(C), as amended. We reverse, however, the conviction of racketeering against the corporate defendant, Whitfield Bus Lines, Inc. A careful reading of the indictment filed against the defendants indicates that defendant Whitfield Bus Lines, Inc. was not specifically charged with racketeering contrary to Section 30–42–4(C); instead, the corporation was named in the indictment as the enterprise with which defendants Robert and Scott Crews were employed or associated.[3] Although a corporate defendant may be charged and convicted of the offense of racketeering, we find that it was error to submit the racketeering charge against defendant Whitfield Bus Lines, Inc. to the jury because the corporate defendant was not specifically charged with commission of such crime in the indictment. NMSA 1978, §§ 30–1–12(E) (Repl.Pamp.1984); 30–42–4. *See also State v. Mabrey*, 88 N.M. 227, 539 P.2d 617 (Ct.App.1975) (defendant may not be punished for a crime without a sufficient charge having been filed, even where defendant voluntarily submitted to the jurisdiction of the court). The fact that Whitfield Bus Lines, Inc. was named in the charge as the affected enterprise did not constitute a charge of racketeering against the corporate defendant.

## III. ISSUE AS TO VARIANCE

■ Defendants also contend that they were tried on and convicted of charges which were not in fact considered by the grand jury; that the indictments returned by the grand jury were vague; and that the statement of facts furnished by the state failed to adequately provide sufficient notice to them regarding the specific charges that defendants were required to defend against.

Defendants further argue that the state was improperly allowed to amend its theory of fraud from allegations that defendants were paying the relevant funds to their drivers and aides as salary to allegations that defendants had fraudulently

---

**3.** Count 20 of the indictment on motion of defendants was ordered by the court to be renumbered as Count 14.

signed contracts or submitted documents representing they would pay certain sums, knowing that they had no intent to pay out all of the sums in drivers' or aides' salaries. Defendants' arguments on this issue are based in part on the instructions that were given to the jury. Defendants argue that there was a variance between the proof presented at trial, the instructions, and the indictment.

Defendants argue that the theory of fraud in the indictment relating to the drivers was based on representations by defendants that they "were paying" aggregate drivers' salaries but that the jury was instructed on a theory that defendants represented they "would pay" the aggregate. Similarly, they contend there was a modification in the allegations regarding fraud as to the payment of aides' salaries. Defendants argue that this change in wording constituted a material alteration in the state's theory of the case. We find defendants' arguments on these matters unpersuasive. It is true that the trial court may not instruct the jury on an offense distinct from the one of which defendant has been charged, see State v. Villa, 85 N.M. 537, 514 P.2d 56 (Ct.App.1973); here, however, the charges against defendants covered an extended time period and evidence existed indicating the existence of a pattern of conduct by defendants wherein they took money under public contracts which specified that the money received by defendants would be paid out by them as provided in the contracts or as represented by them. The allegations in the indictment regarding the misrepresentations as to drivers' salaries and monies paid to the aides were clarified in the statement of facts. We find no material or prejudicial variance.

In support of their contention that they were tried and convicted of charges which were different from those contained in the indictment, defendants rely principally upon two federal decisions. See United States v. Miller, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985); Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

The cases relied on by defendants in support of their argument here are not controlling on the facts before us. A variation is not material where the allegations and proof substantially correspond or where the variance is not of a character which could have misled the defendant at trial. See SCRA 1986, 5–204; see also State v. Ross, 100 N.M. 48, 665 P.2d 310 (Ct.App.1983). The cases on which defendants rely are not to the contrary.

Here, the record indicates that defendants were not misled regarding the nature of the charges against them; they knew they were being charged with fraud in connection with representations concerning monies provided by the state for provision of school bus services. When defendants applied for funds each year, they indicated that they "were paying" drivers' salary aggregate in the previous year and that they "would pay" drivers' salary aggregate during the ensuing school year. The evidence gives rise to a reasonable inference that the fraud charges against defendants arose out of a pattern and practice over a number of years of representing each time the contracts were renegotiated that monies received by them during the prior year had been paid and would continue to be paid as specified in each yearly contract. Defendants' argument concerning variance, and that the instruction using the words "would pay" constitutes a material variance from the language of the indictment using the words "were paying," is without merit. See R. 5–204(C).

The statement of facts and indictment were sufficiently broad to encompass false promises to pay the total allotted for drivers' salaries and false representations concerning the special education aides. Here, the applicable counts of the indictment relating to fraud follow the language of the fraud statute, Section 30–16–6 and the jury instructions were based upon UJI Crim. 14–1640.

Evidence contained in the record indicates that each successive year when defendants applied for new funds under the contracts, circumstantial evidence existed tending to show that defendants represent-

ed to the state and District officials that the money received by them under the prior year's contract had been paid in accordance with the formula referred to in the contract. The evidence also indicated that defendants were aware of the state formula and that public funds were intended to be disbursed to them in accordance with the formula. The testimony and evidence indicated that defendants both represented and promised to pay and contrary to their representations and promises did not pay out the monies received by them as represented or promised.

We have examined each of defendants' arguments marshalled under this point in light of the record and evidence and find the contentions without merit.

## IV. ARGUMENTS TO THE JURY

 Defendants argue that the prosecutor argued facts not in evidence during rebuttal closing argument and that the state urged the jury to convict defendants of crimes not charged in the indictments. This argument arises from a statement made by the prosecutor regarding salaries payable for special education aides. It is true that the prosecutor may not argue facts that are not in evidence, *State v. Gonzales,* 105 N.M. 238, 731 P.2d 381 (Ct. App.1986); however, it is not improper to argue or refer to inferences which may properly be drawn from facts in evidence. *State v. Hernandez,* 104 N.M. 268, 720 P.2d 303 (Ct.App.1986). Moreover, the prosecutor may appropriately respond in his rebuttal argument to arguments which were raised by defendants. *State v. Taylor,* 104 N.M. 88, 717 P.2d 64 (Ct.App.1986).

 Defendants claimed throughout trial and argued in closing that the local school board's transportation director was responsible for requesting money for special education aides. The prosecutor in closing argument responded that it was defendants' idea to request special education aides. This response did not constitute a new theory or facts, since the remark referred to the close relationship between defendants and the local school board's transportation head and related to

arguments which were raised by defendants. Examination of the record indicates the existence of evidence supporting the arguments of the prosecutor.

## V. ISSUE AS TO DUE PROCESS

Defendants also argue that the indictments filed against them were vague and did not adequately apprise them of the specific charges against them. The indictments alleged in part that defendants obtained public monies

in excess of $20,000 by means of fraudulent conduct, practices or representations which were relied on by the Las Cruces School District Number 2, School Board, and the New Mexico Department of Education, believing that the defendants were paying to their bus drivers the aggregate amount of moneys provided for in the contract and generated for driver's salaries * * * when in fact the defendants were not paying these aggregate amounts to the drivers as they represented, but were instead retaining in excess of $20,000 for other purposes.

 In determining an indictment's legal sufficiency, the test is whether it contains the elements of the offense charged and apprises the accused of the nature of the charge so as to enable him to prepare a defense. *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962); *United States v. Tokoph,* 514 F.2d 597 (10th Cir.1975). The defendant in a criminal case is entitled to know what he is being charged with and to be tried solely on those charges. *State v. Crump,* 82 N.M. 487, 484 P.2d 329 (1971); *State v. Mankiller,* 104 N.M. 461, 722 P.2d 1183 (Ct.App.1986); *State v. Johnson,* 103 N.M. 364, 707 P.2d 1174 (Ct.App.1985). However, an indictment alleging the commission of a crime which is subject to being committed by one or more different means is permissible if the defendant has access to the grand jury proceedings and the prosecutor maintains an "open file" policy for defendant's examination so as to accord defendant access to the basis for the charge. *See State v. Hicks,* 89 N.M. 568, 555 P.2d 689 (1976).

■ Here, the record reveals that defendants had access to the grand jury proceedings, and that the prosecutor notified them that the state's file was open for their examination. *See* SCRA 1986, 5–501 & –506. Moreover, the state filed a statement of facts in response to defendants' motion that it be required to identify those practices, representations, or matters of conduct which were alleged to have been fraudulent. Upon review of the record we find no material variance or ensuing prejudice to defendants.

## VI. VALIDITY OF STATEMENT OF FACTS

■ Defendants argue that the statement of facts furnished by the state failed to adequately put them on notice of the charges against them. *See* SCRA 1986, 5–205(C). The purpose of a statement of facts is to provide the defendant with sufficient information about the nature and character of the crime charged so that defendant may properly prepare his defense. *State v. Aaron*, 102 N.M. 187, 692 P.2d 1336 (Ct.App.1984). An examination of the statement of facts provided herein indicates that the statement sets out in detail the means by which the state contended that frauds were alleged to have been committed. We find no defect or invalidity in the statement of facts.

## VII. CLAIM OF PROSECUTORIAL MISCONDUCT

Defendants also assert that the prosecutor engaged in gross misconduct by systematically and substantially misleading the grand jury. Defendants contend that they were indicted for violating an illegal contract provision and that the prosecutor repeatedly allowed and elicited testimony in front of the grand jury falsely indicating that a state regulation existed requiring payment of the drivers' salary aggregate to the drivers as salary. Defendants also argue that the false evidence regarding the existence of a regulation was material to the indictment, and therefore the indictment deprived them of due process of law.

■ To justify dismissal, the prosecutor's conduct must amount to deceitful or malicious overreaching which subverts the grand jury proceedings. *State v. Eder*, 103 N.M. 211, 704 P.2d 465 (Ct.App.1985). The defendant must show substantial, demonstrable prejudice in order to warrant dismissal. *Buzbee v. Donnelly*, 96 N.M. 692, 634 P.2d 1244 (1981); *State v. Velasquez*, 99 N.M. 109, 654 P.2d 562 (Ct.App.1982). If the prosecutor's misconduct substantially influenced the grand jury's decision to indict, then dismissal is appropriate. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). The mere fact that some of the evidence itself was unreliable is not sufficient to require a dismissal of the indictment, nor is an indictment faulty merely because it is based on testimony of a witness whose credibility may later be subjected to question. *Id.; see also Buzbee v. Donnelly.*

■ Here, the indictments made no mention of violation of a regulation or statute, nor have defendants established that the grand jury's indictments were premised on the existence of a nonexistent regulation. Defendants argue that under the totality of the circumstances surrounding the grand jury abuses and the prosecution, the indictment must be dismissed and that an examination of the prosecutor's conduct through the entire proceeding supports their contention that they were denied a fair and unbiased grand jury. We do not agree.

Defendants point principally to three instances of alleged misconduct: (1) allowing testimony regarding the existence of a regulation; (2) eliciting testimony regarding the Attorney General's investigation into reports made by defendants to the Employment Security Division; and (3) suggesting that the vehicle production report figures could be compared to the Employment Security Division reports.

The testimony regarding the existence of a regulation was harmless since there is no evidence that this was relied on by the grand jury in returning its indictment. Similarly, we conclude the other two areas of alleged misconduct did not mislead the

grand jury, since the evidence was admissible to show that the money requested for drivers' salaries was never actually paid as drivers' salaries. It is clear, for example, that the evidence was that the aggregate drivers' salary had to be paid entirely in salaries to drivers, not that each driver was to receive the formula amount for his salary. Thus, we find this contention without merit.

## VIII. CHARGE OF RACKETEERING

■ Defendants Robert and Scott Crews contend that their convictions of racketeering must be reversed, and argue in part that reversal is required because some of the underlying predicate acts were dismissed and the jury acquitted defendants on other charges. They argue there is no way of knowing which counts the grand jury relied on in determining the probable cause to indict for racketeering, and that if any one of those charges that were dismissed, or if any of the charges on which they were acquitted, was the underlying predicate act, then the racketeering conviction cannot stand. Defendants rely on *United States v. Brown*, 583 F.2d 659 (3d Cir.1978), and *United States v. Ruggiero*, 726 F.2d 913 (2d Cir.1984). We do not find these cases dispositive of the racketeering charges filed herein. In each of the cases relied upon by defendants the appellate courts reversed one or more charges relied upon as predicate acts of racketeering, and the reversed convictions were shown to have formed the basis for the jury's determination that there was sufficient evidence of racketeering. Here, the fraud charges upon which defendants were convicted were charges considered by the grand jury to constitute predicate acts of racketeering, and such charges were sufficient to form the basis for the petit jury to determine that Robert and Scott Crews engaged in a pattern of racketeering. Fraud is a predicate offense of the crime of racketeering. § 30–42–3(A)(6). *See also State v. Johnson*, 105 N.M. 63, 728 P.2d 473 (Ct.App.1986). The petit jury verdicts of guilty on each fraud count returned by them constituted a basis to uphold the racketeering verdicts and provided assurance that the jury found defendants guilty of at least two of the predicate acts of fraud as charged in the indictment. *Cf. United States v. Ruggiero*. Simply because defendants were acquitted of some charges and others were dismissed does not require the racketeering charges to be set aside where the jury returned guilty verdicts on other predicate counts. There was adequate evidence in the record to support defendants' convictions of fraud, and such counts constitute predicate charges to uphold the verdicts against defendants Robert and Scott Crews on the charge of racketeering. As discussed under I(C) above, however, defendant Whitfield Bus Lines, Inc. was not specifically charged with commission of the offense of racketeering and its conviction on this count was improper.

## IX. CLAIM OF CUMULATIVE ERROR

■ Lastly, defendants argue that they were denied a fair trial because of the existence of multiple errors which were alleged to have occurred in this case. Cumulative error requires reversal of a defendant's conviction when the cumulative impact of errors occurring at trial is so prejudicial that the defendant was deprived of a fair trial. *State v. Martin*, 101 N.M. 595, 686 P.2d 937 (1984). Defendants cite as error the matters discussed under other points, *supra*, and also argue that the trial court erred in permitting a Division employee to testify regarding the meaning of the drivers' salary provision in the contracts. We find no cumulative error. The employee's testimony was properly allowed because it was offered in response to defendants' arguments concerning their interpretation of contractual provisions; the testimony was relevant to the issue of intent and defendants' argument that their interpretation and conduct was reasonable under the circumstances.

■ Defendants also argue that the trial court erred in permitting the prosecutor to elicit testimony regarding employment of a witness. This testimony was admissible to show alleged bias on the part of the witness, since the evidence indicated that he worked for defendants after leaving the Division. Defendants also allege

error in allowing a former employee of defendants to testify regarding the fact that he did not receive the salary listed in the vehicle production report. This testimony was relevant in that it showed a basis for initiating the investigation and charges filed herein.

After a careful review of the record, we find defendants have failed to establish the existence of substantial prejudice which would justify overturning their convictions; the record as a whole demonstrates that defendants received a fair trial. *State v. Martin.*

## CONCLUSION

The judgment and sentences of defendants are affirmed, except for the conviction of the defendant Whitfield Bus Lines, Inc. for racketeering. The cause is remanded for entry of an amended judgment dismissing Count 14 of the renumbered indictment as to the defendant Whitfield Bus Lines, Inc.

IT IS SO ORDERED.

ALARID and MINZNER, JJ., concur.