1997-NMCA-080

944 P.2d 919

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Tony ARMIJO, Defendant–Appellant.**

**No. 17131.**

Court of Appeals of New Mexico.

July 15, 1997.

692

Tom Udall, Attorney General, Daniel J. Pearlman, Assistant Attorney General, Richard J. Klein, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

Armando Torres, Thomas C. Garde, Torres & Garde, P.C., Los Lunas, for Defendant–Appellant.

## OPINION

ALARID, Judge.

1. Tony Armijo (Defendant) appeals his convictions on one count of fraud in excess of $20,000 in violation of NMSA 1978, Section 30–16–6 (Repl.Pamp.1994); one count of fraud in excess of $250 in violation of Section 30–16–6; one count of making a false public

voucher in violation of NMSA 1978, Section 30–23–3 (Repl.Pamp.1994); and one count of racketeering in violation of NMSA 1978, Section 30–42–4(C) (Repl.Pamp.1989). We affirm.

## I. FACTS

2. On September 29, 1992, the Santa Fe County Grand Jury indicted Defendant on eight counts, including charges of fraud, receiving a bribe, attempted fraud, and racketeering. These charges were brought as the result of actions taken by Defendant in his capacity as executive director of the New Mexico Public School Insurance Authority (Insurance Authority) and of the New Mexico Retiree Health Care Authority (Health Authority). The grand jury also indicted the third-party administrator of the insurance programs for the Insurance Authority and the Health Authority, Glen Slaughter and Associates (Slaughter), and one of Slaughter's employees, Allen Pufahl, on charges of bribing Defendant and fraud in excess of $20,000.

3. The district court severed the trial of Slaughter and Pufahl from that of Defendant. On April 15, 1993, Slaughter was convicted of both charges, while Pufahl was acquitted. Slaughter's convictions were affirmed by this Court in *State v. Glen Slaughter & Assocs.*, 119 N.M. 219, 889 P.2d 254 (Ct.App.1994).

4. On October 15, 1993, the district court granted Defendant's motion to dismiss the indictment on grounds of prosecutorial misconduct, and entered an order quashing the indictment and disqualifying the New Mexico Attorney General's Office from prosecuting Defendant on those charges. A year later this Court reversed the quashing of the indictment and the disqualification, and remanded the cause to the district court for trial. *See State v. Armijo*, 118 N.M. 802, 887 P.2d 1269 (Ct.App.1994).

5. Defendant had a jury trial and was convicted on July 17, 1995, of fraud over $20,000, fraud over $250, filing false public vouchers, and racketeering. The jury acquitted Defendant of the charges of receiving a bribe and attempted fraud in excess of $250. On July 24, 1995, Defendant moved for a new trial "in the interest of justice," and on October 3, 1995, filed a second motion for a new trial based upon allegedly newly discovered evidence. Both motions were denied. This appeal follows.

6. On appeal, Defendant raises seven issues: (1) the trial court erred in denying his motion to sever the counts of receiving a bribe and fraud in excess of $20,000 from the remaining counts; (2) the trial court erred in denying his motion to dismiss the racketeering charge; (3) the trial court erred in denying his motion for directed verdict; (4) the trial court erred in denying his motion for new trial based on prosecutorial misconduct; (5) the trial court erred in denying his second motion for a new trial based on newly discovered evidence; (6) sufficiency of the evidence; and (7) cumulative error. We find Defendant's arguments unpersuasive.

## II. MOTION TO SEVER

7. Defendant made a pretrial motion for severance pursuant to Rule 5–203(C) NMRA 1997. Rule 5–203(C) provides in part, "If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants by the filing of a statement of joinder for trial, the court may order separate trials of offenses, grant a severance of defendants, or provide whatever other relief justice requires." The standard of review for denial of a motion for severance is abuse of discretion. *State v. Jones*, 120 N.M. 185, 186, 899 P.2d 1139, 1140 (Ct.App.1995), *cert. quashed,* 121 N.M. 57, 908 P.2d 750 (1996). In considering a motion for severance, the court must balance "the possibility of prejudice against the interests of judicial economy." *State v. Gammill*, 102 N.M. 652, 655, 699 P.2d 125, 128 (Ct.App.1985) (decided under NMSA 1978, Crim.P.Rule 34 (Repl. Pamp.1980), containing language virtually identical to Rule 5–203(C)); *see also Zafiro v. United States*, 506 U.S. 534, 540, 113 S.Ct. 933, 938–39, 122 L.Ed.2d 317 (1993) (stating that federal rules regarding joinder and severance, similar to New Mexico rules, are designed to promote judicial economy and efficiency and avoid multiplicity of trials, but only insofar as these goals can be achieved without substantial prejudice to defendant's

right to a fair trial). In order to prove that the trial court abused its discretion, the defendant must show that joinder prejudiced his right to a fair trial. *State v. Roybal,* 115 N.M. 27, 31, 846 P.2d 333, 337 (Ct.App.1992).

8. Defendant contends that the trial court erred in denying his motion to sever the counts of fraud over $250, attempted fraud over $250, and making a false public voucher from the counts of fraud over $20,000 and receiving a bribe. The charges of fraud over $20,000 and receiving a bribe were based on allegations that Defendant had permitted Slaughter to host a birthday party for him costing approximately $3,400, and then a few days later had defrauded the Board of Directors of the Insurance Authority (Board) into granting increased contract payments to Slaughter worth more than $20,000. The remaining charges concerned Defendant's misuse of a credit card issued for the account of the Insurance Authority.

9. Defendant contends that the counts should have been severed and separate trials held because the credit card misuse allegations and the Slaughter fraud and bribery allegations each concerned events that were remote in time, did not establish a pattern, and were not provable by the same evidence. *See State v. Gallegos,* 109 N.M. 55, 64, 781 P.2d 783, 792 (Ct.App.1989) (discussing factors supporting holding of abuse of discretion). The multiplicity of charges brought against him, he argues, unfairly caused the jury to cumulate the evidence against him. He also argues that the crimes charged are specific intent crimes, and contends that the jury would be unable to separate his intent at the time he allegedly committed the credit card misuse from the intent he had some months later at the time of the birthday party and the renegotiation of the Slaughter contract. In other words, the multiplicity of charges confused the jury as to which evidence sufficed to prove which charges.

■ 10. The trial court did not abuse its discretion in denying the motion to sever. First, there is no evidence that the multiplicity of charges confused the jury. The record indicates that the jury received proper instructions regarding the specific intent required for conviction under the pertinent statutes, and the evidence of Defendant's conduct on the separate occasions could readily be examined by the jury. The jury demonstrated that it could carefully apply the evidence to the multiplicity of charges by acquitting on the counts of receiving a bribe and attempted fraud. *See State v. Orgain,* 115 N.M. 123, 125, 847 P.2d 1377, 1379 (Ct. App.1993) (stating that defendant's acquittal on some charges and conviction on others showed that defendant had not been prejudiced by multiple charges). Defendant thus failed to demonstrate real prejudice.

11. Second, Defendant has not shown that the multiplicity of charges was cumulative and thus unfairly prejudicial. The charges in the indictment all concern crimes committed by Defendant against the Insurance Authority and the Health Authority within a period of thirteen months and were related to Defendant's dual position during this time as executive director of both entities. These facts alone provide strong support for the district court's exercise of discretion.

12. The fact that the other charges were predicate offenses for the racketeering charge make joinder particularly appropriate. In order to establish a pattern of conduct for purposes of the racketeering charge, it was necessary for the State to prove that Defendant had committed at least two predicate offenses—such as felony fraud, *see* NMSA 1978, § 30–42–3(A)(6) (Repl. Pamp.1989), and that these offenses constituted a prohibited pattern of racketeering activity—such as engaging in racketeering activity at least twice within a five-year period, *see* NMSA 1978, § 30–42–3(D) (Repl. Pamp.1989). It was not abuse of discretion for the district court to refuse to sever the racketeering predicate offenses from the trial on racketeering charges.

### III. MOTION TO DISMISS THE RACKETEERING CHARGE

13. Defendant argues that because the Insurance Authority is a governmental agency, it is not an "enterprise" under the Racketeering Act, NMSA 1978, §§ 30–42–1 to –6 (Repl.Pamp.1989). He also argues that the

Racketeering Act requires that there be co-conspirators in the enterprise, but this issue was not presented to the trial court and has not been preserved for review. *See Graham v. Cocherell*, 105 N.M. 401, 404, 733 P.2d 370, 373 (Ct.App.1987) (holding that appellate court's scope of review is limited to questions that were both presented to and ruled on by trial court). *See also* Rule 12–216(A) NMRA 1997 (to preserve an issue for appellate review, it generally must be raised in the trial court).

14. Defendant notes that the Racketeering Act is based on the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–68 (1994) (RICO), and therefore federal cases interpreting RICO are instructive to New Mexico courts in interpreting our Act. *See State v. Johnson*, 105 N.M. 63, 68, 728 P.2d 473, 479 (Ct.App. 1986). He contends that, under federal law, governmental agencies are not considered "enterprises" for the purposes of racketeering charges, citing *United States v. Thompson*, 669 F.2d 1143, 1148 (6th Cir.1982) and *United States v. Mandel*, 415 F.Supp. 997, 1021 (D.Md.1976), *rev'd on other grounds*, 591 F.2d 1347 (4th Cir.), *aff'd on other grounds by an equally divided court*, 602 F.2d 653 (4th Cir.1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980). Defendant's counsel, however, failed to inform this Court that *Thompson* later was reversed by the Sixth Circuit sitting *en banc. See United States v. Thompson*, 685 F.2d 993 (6th Cir.1982) (en banc). The Sixth Circuit found no "Congressional intent to exclude state and local governments from the scope of the act[,]" *id.* at 997, and affirmed the defendant's racketeering convictions. The court stated that "enterprise" in the context of the case clearly referred to the office of the governor. *Id.* at 1002.

■ 15. In *Mandel*, the Federal District Court, District of Maryland, concluded that public entities such as governments and states should not be considered enterprises for the purposes of RICO. This appears to be the only federal case so holding. Every Federal Circuit Court of Appeals ruling on the issue has held that governmental agencies should be considered "enterprises" for the purposes of racketeering statutes. *See, e.g., United States v. Angelilli*, 660 F.2d 23, 31 (2d Cir.1981) (holding that state civil court is an enterprise for RICO purposes); *United States v. Long*, 651 F.2d 239, 241 (4th Cir. 1981) (holding that state senate is an enterprise for RICO purposes); *United States v. Clark*, 646 F.2d 1259, 1264 (8th Cir.1981) (holding that office of county judge is an enterprise for RICO purposes); *United States v. Grzywacz*, 603 F.2d 682, 686 (7th Cir.1979) (holding that city police department is an enterprise for RICO purposes); *United States v. Frumento*, 563 F.2d 1083, 1092 (3d Cir.1977) (holding that state tax bureau is an enterprise for RICO purposes); *United States v. Ohlson*, 552 F.2d 1347, 1350 n. 3 (9th Cir.1977) (Per Curiam) (affirming racketeering conviction in which state bureau of narcotic enforcement is identified as RICO enterprise); *United States v. Brown*, 555 F.2d 407, 416 (5th Cir.1977) (holding that city police department is an enterprise for RICO purposes). We follow the lead of these federal appellate courts and hold that governmental agencies may be considered "enterprises" for the purposes of the Racketeering Act.

## IV. SUFFICIENCY OF THE EVIDENCE

■ 16. Defendant claims that the trial court should have granted his motion for a directed verdict because the State failed to fulfill its burden of proof. Defendant also appeals the verdict on the grounds of insufficiency of the evidence. A motion for a directed verdict challenges the sufficiency of the evidence, *see State v. Romero*, 111 N.M. 99, 101, 801 P.2d 681, 683 (Ct.App.1990); therefore we address these issues together. In reviewing for the sufficiency of the evidence, the question is whether substantial evidence exists of either a direct or circumstantial nature to support a verdict of guilty beyond a reasonable doubt with respect to each element of the crime. *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). The evidence is viewed in the light most favorable to the verdict and all conflicts are resolved in favor of the verdict. *State v. Crews*, 110 N.M. 723, 729, 799 P.2d 592, 598 (Ct.App.1989).

■ 17. Defendant contends that the State presented insufficient evidence to support his convictions. We first examine the conviction for fraud in excess of $250. The elements of fraud in excess of $250 are: (1) misrepresentation of fact by word or conduct; (2) with intent to deceive or cheat; and (3) due to the misrepresentation the defendant obtained anything of a value of more than $250 belonging to someone else. Rule 14–1640 NMRA 1997. Evidence was presented that Defendant had use of an Insurance Authority credit card, with the proviso that the card was to be used for Insurance Authority business expenditures only. On August 12, 1990, Defendant signed a credit card receipt on the Insurance Authority card at the Frontier Hotel in Las Vegas, Nevada, to pay for charges incurred by his daughter which were unrelated to Insurance Authority business. The charges were in the amount of $287.30. On August 25, 1990, Defendant used the Insurance Authority card to pay $209.90 for loft beds to be delivered to his son at the University of Notre Dame in South Bend, Indiana. Defendant also used the card on August 26, 1990, to pay $192.78 at the Holiday Inn in South Bend; he admitted prior to trial that this charge was not an Insurance Authority related expense.

18. Evidence was also presented that Defendant had knowledge of the following facts: He knew that the card was to be used only for Insurance Authority business expenses; that use of the credit card constituted a representation that the charges were for business expenses; that the bills would be paid without further action on his part once he had used the card; and that the card had been used for charges that were not for business expenses. Although Defendant did repay these unauthorized charges, he did not do so until an audit had uncovered their existence. This constitutes sufficient evidence to support his conviction for fraud in excess of $250.

■ 19. Defendant contends that the fact that he repaid the improper charges and evidence that he was distraught over the sudden death of his wife makes evidence of his intent insufficient to support his conviction. We disagree. Fraudulent intent may be inferred from Defendant's conduct and words. *Crews,* 110 N.M. at 729, 799 P.2d at 598. Defendant made no attempt to reimburse the Insurance Authority for these charges until the charges were uncovered during an audit. The fact that Defendant may have later reimbursed the Insurance Authority for some of the improper personal expenses charged to the Board does not as a matter of law contravene the sufficiency of the evidence of fraud as Defendant suggests. *See State v. Duran,* 107 N.M. 603, 605, 762 P.2d 890, 892 (1988) (evidence sufficient when elements of offense are established beyond a reasonable doubt by direct or circumstantial evidence).

■ 20. Defendant was also convicted of making a false public voucher. The elements of that offense are that (1) Defendant knowingly, intentionally, or willfully caused a false material statement to be made upon an Insurance Authority voucher or invoice, (2) with the intent that the voucher or invoice be relied upon for the expenditure of public money. NMSA 1978, § 30–23–3 (Repl. Pamp.1994). The following evidence was presented: Defendant made a $213.75 charge on an Insurance Authority credit card on July 27, 1989, at the Lady Luck Casino in Las Vegas, Nevada. The money was for a cash advance, and was not for an authorized Insurance Authority business expense. By making this charge, Defendant caused a false statement to be made on an Insurance Authority voucher and on an invoice supporting that voucher. The jury could infer his intent that the voucher be relied upon for the expenditure of public money through his actions. This evidence is sufficient to support his conviction for making a false public voucher.

■ 21. Defendant also claims insufficiency of the evidence on his conviction of fraud in excess of $20,000. The elements of fraud in excess of $20,000 are: (1) misrepresentation of fact by word or conduct; (2) with intent to deceive or cheat; and (3) due to the misrepresentation the defendant obtained anything of a value of more than $20,000 belonging to someone else. Rule 14–1640 NMRA 1997. We examine the evidence presented at trial. At a June 17, 1991, Insur-

ance Authority Board meeting, Defendant, acting in his capacity as executive director of the Board, made certain representations to the Board, including: (1) that an oral agreement had been made at an October 1989 Board meeting to provide pass-through payments to Slaughter for direct expenses, such as postage and printing; (2) that the existing contract with Slaughter was for $650,000, plus postage and printing; (3) that Slaughter had· proposed a contract for $979,440 but Defendant had negotiated that figure down to $695,000; and (4) that the existing con-·tract with Slaughter should be increased to $695,000, plus up to $50,000 for postage and printing, because the enrollment had increased by "3,000 to 4,000 people over the last two years." Based on these representations, the Board amended the minutes of the October 1989 meeting to reflect inclusion of direct expenses to Slaughter, allowing approximately $17,000 in past payments, and made a new contract with Slaughter providing for payment of $695,000, plus up to $50,000 for postage and printing.

22. Further evidence was presented that there had been no oral agreement at the October 1989 Board meeting to provide for pass-through payments for direct expenses; the amount of the existing contract was for $602,000, with no pass-through payments; Slaughter had never submitted a request for $979,440; and enrollment during Slaughter's administration of the previous contract had actually declined. This is sufficient evidence to support Defendant's conviction for fraud in excess of $20,000. There was evidence that Defendant misrepresented facts to the Board that caused them to make payments to Slaughter in excess of $20,000 that the Board would not have made absent those misrepresentations. Defendant's intent to deceive can be inferred by the jury from his actions.

▇▇ 23. Finally, we turn to the evidence supporting Defendant's conviction for racketeering. The elements of racketeering are: (1) Defendant was associated with an enterprise; (2) while associated with this enterprise, Defendant directly or indirectly conducted or participated in the conduct of the affairs of the enterprise by engaging in a pattern of racketeering activity, which includ-

ed the two counts of fraud. NMSA 1978, §§ 30–42–3, –4 (Repl.Pamp.1989). Evidence was presented that Defendant was executive director of the Insurance Board and while in that capacity he committed two acts of felony fraud victimizing the Insurance Authority. We conclude that this evidence was sufficient to support Defendant's conviction for racketeering.

## VI. MOTIONS FOR A NEW TRIAL

▇▇ 24. Defendant made two motions for a new trial pursuant to Rule 5–614 NMRA 1997. Both motions for a new trial were denied; Defendant appeals these rulings. Motions for a new trial are generally not favored. *State v. Stephens*, 99 N.M. 32, 35, 653 P.2d 863, 866 (1982). The decision to grant or deny a motion for new trial is within the broad discretion of the trial court, and its decision will be reversed only upon a showing of clear and manifest abuse of discretion. *State v. Chavez*, 98 N.M. 682, 684, 652 P.2d 232, 234 (1982).

### A. First Motion for a New Trial

25. On appeal of the court's order on the first motion, Defendant argues that the State breached its duty under Rule 5–501 NMRA 1997, to provide full disclosure of exculpatory evidence to the defense. Rule 5–501(A)(5) provides in part that the State must disclose to the defense a list of witnesses "together with any statement made by the witness ... which is within the knowledge of the prosecutor[.]" Defendant claims that the State failed to disclose a statement made by State's witness Thomas Marreel, in which Marreel stated that there had been a 2,000 to 3,000 participant increase in Insurance Authority medical enrollment as the result of the addition of Eastern New Mexico University, Highlands University, and the Portales and Clovis School Districts.

▇▇ 26. The test for determining whether a conviction should be reversed for failure to disclose exculpatory evidence has three elements: (1) the state either breached some duty or intentionally deprived the defendant of evidence; (2) the improperly "suppressed" evidence was material; and (3) the suppression of evidence prejudiced the defen-

dant. *State v. Sandoval,* 99 N.M. 173, 175, 655 P.2d 1017, 1019 (1982). "The prejudice part of the test requires the court to assess whether the omitted evidence created a reasonable doubt which did not otherwise exist." *Id.* " 'If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial.' " *Id.,* quoting *United States v. Agurs,* 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976).

■ 27. The State argues that there was no dispute at trial that enrollment increased substantially between June 1989 and January 1, 1990, the first date that Slaughter began billing for services based on Insurance Authority enrollment. Evidence presented at trial showed that the average · medical enrollment increased from 16,319 in June 1989 to 19,219 on January 1, 1990, an increase of 2,900 enrollees. Thus, the essence of the information provided by Marreel was not, in fact, withheld from the defense in violation of Rule 5–501. Moreover, this information was irrelevant to the State's claim that Defendant had intentionally misled the Board on June 17, 1991 at the Board meeting, by stating that enrollment had increased "by 3,000 to 4,000 people over the past two years." The question was whether Slaughter's fee increase for 1991–92 was justified by an increase in enrollment. Since the beginning of 1990, when Slaughter began being paid on a per capita basis, medical enrollment had actually decreased by over 2,000 persons. The information that enrollment had increased between June 1989 and January 1990 thus was not material to Defendant's conviction. Finally, Defendant fails to show how he suffered prejudice as a result of the State withholding this information. We do not believe this information could give rise to a reasonable doubt that does not otherwise exist.

■ 28. Defendant also contends that the State committed prosecutorial misconduct by presenting argument to the jury based on facts known to be inaccurate. He claims that the State argued that Slaughter had requested a 10% increase in fees and actually received a 15% increase, when in fact Slaughter had requested a 22% increase.

The State calculated the amount of increase based on a memo prepared by Mike Nunez for the Insurance Authority dated May 3, 1991, stating that the average fees paid to Slaughter for January through March 1991 were $55,135. Defendant calculates the amount of increase requested based on Slaughter's bills for January, February, and March 1991, which show fees of $49,496.15, $49,611.43, and $49,455.45 respectively. Defendant argues that the State knew the fee increase requested amounted to 22%, and that it committed prosecutorial misconduct by arguing that the increase requested had been only 10%.

■ 29. We note that these exhibits were available to the defense in discovery and had been admitted into evidence during the State's case. The defense, however, did not object to the State's characterization of this evidence during closing argument. "Failure to make a timely objection to alleged improper argument bars review on appeal, unless the impropriety constitutes fundamental error." *State v. Gonzales,* 113 N.M. 221, 229, 824 P.2d 1023, 1031 (1992). "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *State v. Orosco,* 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992). We do not find admission of this argument so egregious as to constitute fundamental error.

30. The State made fair comment on the evidence. Our examination of the record shows Slaughter's employee Miguel Nunez wrote a memo to Insurance Authority benefits consultant Thomas Marreel on May 3, 1991, discussing an April 22, 1991, meeting among Nunez, Armijo, Marreel, Arnold Maxwell, and Jack Peterson. The memo calculated "the total dollar impact of the fee adjustments negotiated during our meeting," based on the average fee over the period January 1991 through March 1991. The amount of the 10% increase may have been erroneously calculated in the May 22 memo, but the dollar amount of the increase was irrelevant to the State's case. The memo indicates that the negotiated fee increase was 10%. Nunez

also testified at trial that Slaughter had asked for a 10% fee increase at the April 22 meeting and actually received a 15% increase. The State's comments on this evidence were not improper and did not deny Defendant his right to a fair trial. We conclude that the trial court did not abuse its discretion by denying Defendant's first motion for a new trial.

## B. Second Motion for a New Trial

31. Defendant made a second motion for a new trial on October 3, 1995, based upon allegedly newly discovered evidence. Defendant contends that he received a number of Slaughter's internal documents from Allan Pufahl in August 1995. Pufahl had taken possession of the documents from his counsel John Wentworth in November 1993, following Pufahl's criminal trial. The documents were stored between November 1993 and August 1995 at Pufahl's home in Taos, New Mexico.

32. Four documents were brought to the district court's attention. None of the documents are dated, but Pufahl contends by affidavit that they were prepared after the April 22, 1991, meeting and before the June 17, 1991, meeting. The first document appears to provide figures for projected fees in the amount of $979,440. In order to reach this figure, the document projects increased enrollment of over 30% and increased per capita fees of 23.5% for medical participants and 30% for dental participants. The other three documents set out the basis for the approved amount of $695,934.54. These documents indicate a 10% increase in per capita fees and an additional increase of $36,000 for continued employment of an employee. Defendant contends that these documents show that the $979,440 figure was a legitimate request made by Slaughter during the course of negotiations, and provide a reasonable explanation for how Slaughter got an approximately 15% fee increase after only seeking a 10% increase. The State responds that the information was known to Defendant at the time of trial, could have been discovered before trial, and would not have changed the result if a new trial had been granted.

33. A motion for a new trial on the grounds of newly discovered evidence calls for the exercise of the sound discretion of the trial court and is properly denied unless the newly discovered evidence is such that: (1) it will probably change the result if a new trial is granted; (2) it must have been discovered since the trial; (3) it must be such that it could not have been discovered before trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative; and (6) it must not be merely impeaching or contradictory. *State v. Fero*, 107 N.M. 369, 371–72, 758 P.2d 783, 785–86 (1988).

34. We turn first to the issue whether these documents could have been discovered before trial by the exercise of due diligence. Defendant, Slaughter, and Pufahl were indicted simultaneously on related charges and their causes were joined. The increased fees received by Slaughter following the June 17, 1991, Insurance Authority Board meeting were the basis of charges of fraud in excess of $20,000 brought in the indictments. Later Slaughter's and Pufahl's cases were severed from Defendant's case, but Defendant clearly should have been aware of the similarity of issues and evidence in the respective cases.

35. The allegedly newly discovered documents were available for review and copying by Defendant at Wentworth's law firm through November 1, 1993. Defendant went to the law firm on a number of occasions to review documents and had access to all documents relevant to his case, including presumably the ones at issue. After November 1, 1993, when the documents were returned to Pufahl, Defendant made no request to review documents at the law firm. The relevance of Slaughter's file on the Insurance Authority negotiations should have been apparent to Defendant, and we believe that with the exercise of due diligence this information could have been discovered prior to trial.

36. Even if this evidence could otherwise meet the standard set in *Fero* for a new trial based on newly discovered evidence, we would defer to the trial court's judgment on whether admission of this evidence would change the result of the trial. Assuming that

a jury would find that Defendant did not make a misrepresentation when he told the Board that he had negotiated Slaughter down from a request for $979,440 and that Slaughter had asked for an increase of at least 15%, the result would probably be the same based on the remaining evidence against Defendant. To wit, there was substantial evidence that, because of Defendant's misleading statement that a mistake had been made in Slaughter's contract so that it did not correspond with oral agreements, the Board approved $17,000 in past payments to Slaughter for "direct expenses" that were not covered in the original contract. There was also substantial evidence that Defendant made misrepresentations to the Board that caused the Board to give Slaughter a new contract with increased compensation. These misrepresentations include the statement that the present contract was for $650,000 plus direct expenses when in fact it was for $602,000 with direct expenses included, and the statement that Slaughter deserved an increase because enrollment had increased by 3,000 to 4,000 over the past two years, when in fact enrollment had decreased since the last contract extension. The trial court did not abuse its discretion in ruling that the result probably would not change if this evidence were admitted at a new trial. We hold that the trial court ruled correctly in denying Defendant's second motion for a new trial.

## VII.  CUMULATIVE ERROR

37.  Defendant also urges reversal based on cumulative error. We find no error and therefore no cumulative error. *See State v. Larson,* 107 N.M. 85, 86, 752 P.2d 1101, 1102 (Ct.App.1988).

## VIII.  CONCLUSION

38.  For the foregoing reasons we affirm the judgment and sentence of the trial court.

39.  **IT IS SO ORDERED.**

APODACA and BUSTAMANTE, JJ., concur.