2008-NMCA-126

193 P.3d 558

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Julio CHAVEZ, Defendant–Appellant.**

No. 26,563.

Court of Appeals of New Mexico.

June 20, 2008.

Certiorari Granted, No. 31,202, Aug. 6, 2008.

Certiorari Denied No. 31,217, Aug. 6, 2008.

Gary K. King, Attorney General, Katherine Zinn, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

PICKARD, Judge.

{1} Defendant appeals his convictions for child abuse by endangerment of his three children. He challenges (1) whether the evidence was sufficient to support his convictions, (2) whether the evidence supported only a single conviction under New Mexico law, (3) whether the trial court erred in declining to grant a directed verdict on the child abuse resulting in death count, and (4) whether giving the child abuse uniform jury instruction (UJI) was fundamental error. We affirm the trial court on all issues except the second, and we reverse one of Defendant's convictions.

## FACTS

{2} Defendant is the father of Juan, who was four years old at the time criminal child abuse charges were filed against Defendant; Leo, who was two years old; and Shelby, who died at the age of five months. The mother of the children is Jennifer Wheeler. In 2001, an anonymous referral was made to the New Mexico Children, Youth and Families Department (CYFD) for neglect. After the referral, Defendant did not apply for Housing and Urban Development housing because he wanted the family members to "do it on [their] own." Instead, Defendant and his family moved into a trailer in Tularosa, New Mexico, despite the fact that Wheeler did not believe that the trailer was a healthy, safe environment for the children.

{3} Wheeler took a job outside the home working long hours while Defendant stayed home with the children. Wheeler testified that although Defendant sometimes worked to support the family, he mostly worked on his own car and played video games. Most of the money he earned went into his car. When the boys misbehaved, Defendant hit them. When Shelby cried, Defendant would purposefully ignore her. The children did not wear any shoes, and there was no hot water in the home. Defendant would leave Shelby in her bassinet or child swing while he worked outside on his car. Sometimes Defendant would visit Wheeler at work, leaving all three children unattended at home.

{4} At some point, Shelby's bassinet broke, and Defendant fashioned a bed for her out of a dresser drawer. The night Shelby died in 2003, Wheeler placed her in the drawer with a pillow, a sheet, and a blanket. Shelby woke up at 3:30 a.m., but she would not take a bottle. Defendant and Wheeler placed her on her stomach in the drawer, and Wheeler went back to sleep. Later, Defendant shook Wheeler awake, saying that Shelby was not breathing. Attempts to resuscitate Shelby failed, and law enforcement was notified. It was noted by a medical investigator at the time that Defendant did not know the birthdays of his children and that Shelby had never been taken to a doctor.

{5} The trailer in which the family lived was first investigated by the medical investigator. The investigator observed food, dirty bottles, and clothes on the floor. She also observed a broken window and an unclean kitchen and bathroom. There were no signs of drugs or alcohol besides a couple of empty beer bottles in a trash bag. The investigator opined that the drawer in which Shelby died was "not wide enough or long enough for an infant to move around freely." However, there was nothing suspicious about Shelby's body, which appeared to have been clean and healthy. Dr. Ross Reichard, who performed Shelby's autopsy, testified that the cause of her death was "undetermined," but he testified that the small size of the drawer in which she slept was a possible cause of her death.

{6} The testimony of several witnesses detailed the dangers to small children present in the family's trailer and yard. Detective Norbert Sanchez made a videotape of the scene of Shelby's death, and the tape was played for the jury while Sanchez described its contents. Physical dangers were cataloged, including a nearly collapsed ceiling, broken windows, and glass shards on the ground. The smoke detector had no batteries, and items such as razors and chemicals were left where the children could access them. Unsanitary conditions were observed, including rodent feces in the kitchen cabi-

nets, on the dishes, and in the drawer-bed in which Shelby died; a bag of dirty diapers that appeared to have been left on the ground for some time; and mold in the bathroom and shower. Outside of the home, there was a trash pit at ground level that had flies and a very pungent odor, rusty nails exposed in lumber lying on the ground, and open cans of solvent and cleaning fluid on the porch.

{7} Deputy Lisa Delorm testified concerning the dangers to children she saw at the trailer, including car parts in the yard, a gap in the ramp leading to the home, open cans of paint thinner on the porch, and an accessible razor in the bathroom. She also saw mice in the trailer, but she did not see any mousetraps. Tamantha Means, a cousin of Defendant who lived in the trailer before Shelby's death, testified that "[t]he home was a disaster" and that the trailer and the children were "filthy." She testified that on at least one occasion she came home and found the children alone. Officer Damian Picazzo, CYFD social worker Antoinette Pirelli, and CYFD supervisor Pam Wong also testified to conditions in the home. Additional evidence gathered from testimony adduced at trial, including evidence elicited during the viewing of Detective Sanchez's videotape, will be included in our discussion below as needed.

## DISCUSSION

### Sufficiency of the Evidence

{8} Defendant challenges the sufficiency of the evidence to support his three convictions for third-degree felony child abuse. "In reviewing the sufficiency of evidence used to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *State v. Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [a d]efendant's version of the facts." *Id.*

{9} In order to prove child abuse by endangerment, the State had to prove beyond a reasonable doubt that Defendant knowingly, intentionally, or negligently, and without justifiable cause, caused or permitted his children to be placed in a situation that may have endangered their lives or health. NMSA 1978, § 30–6–1(D)(1) (2001) (amended 2004 and 2005). To prove Defendant guilty under the negligence standard set forth in our child abuse statute, the State had to prove beyond a reasonable doubt that Defendant "knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of" his children. Section 30–6–1(A)(3).

{10} We hold that the evidence before the trial court was sufficient for the jury to convict Defendant of child abuse by endangerment. First, we hold that there was sufficient evidence that Defendant "knew or should have known of the danger involved." *Id.* In 2001, Defendant and the children's mother were reported to CYFD based on the conditions in which they were raising their sons. A visual inspection from outside the home revealed both unsanitary and unsafe conditions. The couple was referred by CYFD for help in obtaining case management services to ensure that they had the resources to take care of their children and to learn adequate parenting skills, but they did not avail themselves of these services. A rational jury could infer from this evidence that Defendant understood that the conditions in which he was raising his children may have endangered them and thus were cause for remedial action on his part. In fact, Defendant subsequently acknowledged that the conditions in which he was raising his sons in 2001 were not suitable for children.

{11} We hold further that the evidence supports a finding that Defendant "acted with a reckless disregard for the safety or health" of his children because, by raising them in the conditions described later in this opinion, he caused or permitted his children to be "placed in a situation that may [have] endanger[ed] [their lives] or health." Section 30–6–1(A)(3), (D)(1). The trailer had no gas utility and no alternative heating source or hot water. It was infested with mice, and rodent feces were found throughout, including in the kitchen cabinets, on the dishes, and in the drawer-bed in which Shelby died. An area of the living room ceiling had sustained

water damage and appeared ready to collapse. One window was missing, another was broken, and glass shards were on the ground. The kitchen area had several cabinet doors either missing or hanging. A strong-smelling bag of dirty diapers appeared to have been left on the ground for some time. There was a water leak in the house, and the bathroom and shower were moldy. The smoke detector had no batteries, and items such as razors and chemicals were left where the children could access them.

{12} Outside the home, there was a trash pit at ground level that had flies and a very pungent odor. A shed was falling in, and there were rusty nails exposed in lumber lying on the ground. Open cans of solvent and cleaning fluid were observed on the porch. There were car parts, spray cans, matches, and other objects that could be dangerous to children found around the yard. The ramp leading to the trailer had a gap wide enough to injure a child.

{13} Defendant allowed Juan and Leo to run around in this environment, where they were observed in diapers or underwear, unwashed, and without shoes. Defendant often left Shelby inside on her baby swing or in her bed while he worked on his car outside. Defendant sometimes left all three children unattended in this environment. Finally, Shelby had been sleeping regularly in a drawer that she had little room in which to move around, a circumstance which may have created a danger to her health and may have resulted in suffocation as a possible cause of her death.

{14} When viewed in the light most favorable to the State, the evidence supports Defendant's convictions. "By including endangerment in Section 30–6–1, the Legislature expressed its intent to extend the crime of child abuse to certain conduct even if the child has not suffered physical harm." *State v. Graham*, 2005–NMSC–004, ¶ 9, 137 N.M. 197, 109 P.3d 285. Because "the Legislature did not intend to criminalize conduct creating a mere possibility, however remote, that harm may result to a child," there must be "a reasonable probability or possibility that the child will be endangered." *Id.* (internal quotation marks and citations omitted). Testimony in this case, regarding the trailer and yard in which Defendant's children lived, the size of the drawer-bed in which Shelby slept, and Defendant's failure to protect his children from the many potential harms with which he surrounded them, described more than a remote possibility that the safety and health of Defendant's children were endangered. We hold that a rational jury could have found beyond a reasonable doubt that Defendant knowingly, intentionally, or negligently, and without justifiable cause, caused or permitted his children to be placed in a situation that may have endangered their lives or health and that Defendant knew or should have known of the danger involved and acted with a reckless disregard for the safety or health of his children. *See Rojo*, 1999–NMSC–001, ¶ 19, 126 N.M. 438, 971 P.2d 829.

{15} Defendant argues that he has been criminally punished because of his poverty. However, the jury heard testimony that Defendant's landlord would have allowed a reduction in rent for the cost of any improvements or repairs Defendant chose to make to the trailer and that Defendant assured Wheeler that he would make the trailer habitable. The cost of eliminating the aforementioned dangers, therefore, would not have resulted in additional financial hardship or required additional outlay of funds. Moreover, as noted by CYFD supervisor Wong, there is a difference between poverty and neglect. In this case, the evidence established that the dangerous, unsanitary living conditions found in and around the trailer and the confined space in which Shelby slept were not the necessary by-products of Defendant's poverty, but were instead the result of Defendant's lifestyle choices and parenting decisions.

{16} Defendant also seeks relief on the ground that the underlying conduct giving rise to his convictions was not itself criminal. However, our child abuse statute does not require that the conduct forming the basis for an endangerment charge must itself be a crime. *See* § 30–6–1(D)(1). Rather, the conduct need only cause the child to be "placed in a situation that may endanger the

child's life or health." *Id.* We also reject Defendant's argument that his conduct did not place his children in the "direct line of physical danger" because the risks to which he exposed his children were "nowhere near the risks involved in being shot, stabbed, or involved in a car accident." We find no support for this argument in our case law, which proscribes any adult conduct that presents "a reasonable probability or possibility" that a child may be endangered. *Graham*, 2005–NMSC–004, ¶ 9, 137 N.M. 197, 109 P.3d 285 (internal quotation marks and citation omitted).

### Unit of Prosecution

{17} Defendant contends that his three convictions for child abuse should be reduced to a single count, following this Court's reasoning in *State v. Castañeda*, 2001–NMCA–052, 130 N.M. 679, 30 P.3d 368. In *Castañeda*, we held that a driver who endangered three child passengers by driving drunk was only subject to a single conviction for child abuse because "the abuse of the three children occurred during a single criminally negligent act and therefore constituted only one violation of the statute." *Id.* ¶ 18. In so holding, we examined the facts of that case in light of the "indicia of distinctness" set forth in *Swafford v. State*, 112 N.M. 3, 13, 810 P.2d 1223, 1233 (1991). *Castañeda*, 2001–NMCA–052, ¶ 13, 130 N.M. 679, 30 P.3d 368 (internal quotation marks and citation omitted). Applying these indicia to the case before us, we reverse one of Defendant's three convictions for child abuse by endangerment.

{18} "Where an accused is charged with multiple violations of a single statute and raises a double jeopardy challenge, we must determine whether the legislature intended to permit multiple charges and punishments under the circumstances of the particular case." *Castañeda*, 2001–NMCA–052, ¶ 13, 130 N.M. 679, 30 P.3d 368. Because Section 30–6–1 does not clearly define the unit of prosecution, we must determine whether Defendant's offenses are separated by sufficient "indicia of distinctness." *See Castañeda*, 2001–NMCA–052, ¶ 13, 130 N.M. 679, 30 P.3d 368 (internal quotation marks and citation omitted). "[I]f the defendant

commits two discrete acts violative of the same statutory offense, but separated by sufficient indicia of distinctness, then a court may impose separate, consecutive punishments for each offense." *Swafford*, 112 N.M. at 13, 810 P.2d at 1233. These indicia include (1) the temporal proximity of the acts, (2) the location of the victims during each act, (3) the existence of an intervening event, (4) the sequencing of acts, (5) the defendant's intent as evidenced by his conduct and utterances, and (6) the number of victims. *Castañeda*, 2001–NMCA–052, ¶ 13, 130 N.M. 679, 30 P.3d 368.

{19} The State concedes that Defendant's convictions for child abuse of his two sons are premised on a singular, continuous course of conduct related to the living conditions in the family's trailer and Defendant's failure to properly clothe and supervise his sons in this environment. The State further concedes that, under *Castañeda*, Defendant's conduct with regard to his two sons constituted only one violation of the child abuse statute and that he should be punished accordingly. *See id.* ¶ 14 (holding that because the defendant committed "one continuous act" of DWI with multiple children in her vehicle who were also not restrained by seatbelts, the defendant was subject to punishment for only one conviction for child abuse despite fact that there were multiple victims of the abuse); *see also State v. Cuevas*, 94 N.M. 792, 794, 617 P.2d 1307, 1309 (1980) (holding that despite the fact that numerous juveniles were present, the defendant's conduct constituted only one act of contributing to the delinquency of a minor where the facts did not indicate any differences in the relationships between the defendant and individual juveniles, the criminal act occurred at one place and at one time, and no juvenile was treated differently than any other), *overruled on other grounds by State v. Pitts*, 103 N.M. 778, 780, 714 P.2d 582, 584 (1986). We agree that the offenses that gave rise to Defendant's convictions for child abuse by endangerment of his sons were not sufficiently separated in time and space to warrant separate convictions, and we reverse one of Defendant's two convictions for child abuse by endangerment of his sons. To the extent

that the State asks us to reconsider *Castañeda*, we decline to do so.

{20} Defendant further contends that *Castañeda* requires that we reverse his conviction for child abuse by endangerment of Shelby, leaving him subject to only a single conviction under Section 30–6–1(D)(1). We disagree. Defendant placed Shelby in a drawer-bed that was too small and, combined with the bedding, gave Shelby no room to move if the bedding interfered with her breathing. In doing so, Defendant subjected his daughter to an entirely different danger to her life and health than any to which he exposed his sons, one that we hold is sufficiently distinct from the unsanitary living conditions and household dangers to which all three children were routinely subjected to warrant a separate conviction. The fact that Defendant was acquitted of child abuse resulting in death does not alter our analysis. *See State v. Leyba*, 80 N.M. 190, 195, 453 P.2d 211, 216 (Ct.App.1969) (noting that "we may only speculate as to why the jury acquitted [the] defendant" of one of the charges against him and that this Court's "business is to review the verdict of conviction").

{21} Moreover, "when determining the appropriate unit of prosecution, the focus is upon the prohibited act." *State v. House*, 2001–NMCA–011, ¶ 20, 130 N.M. 418, 25 P.3d 257 (surveying national authority on a unit of prosecution question under our vehicular homicide statute). " '[A] charge of multiple counts of violating a statute is appropriate only where the actus reus prohibited by the statute—the gravamen of the offense—has been committed more than once.' " *Id.* ¶ 19 (quoting *Wilkoff v. Superior Court*, 38 Cal.3d 345, 211 Cal.Rptr. 742, 696 P.2d 134, 137 (1985) (en banc)). The gravamen of the offense with which Defendant was charged under our child abuse statute was that of "causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health." Section 30–6–1(D)(1). In essence, Defendant committed two acts: (1) causing all three children to live in dangerous, unsanitary conditions and (2) causing Shelby to sleep in a drawer that was dangerously small for her. Because the actus reus prohibited by the child abuse statute

was committed twice, two convictions are warranted.

**Denial of Motion for Directed Verdict**

{22} Defendant argues that the trial court erred when it failed to direct a verdict of acquittal on the charge of child abuse resulting in death. He contends that the evidence was insufficient to support a conviction on the charge that Defendant killed Shelby because the State's medical expert deemed Shelby's cause of death to be "undetermined" and there was "no nexus between the undetermined cause of death and the condition of the home." He argues that the trial court was thus obligated to dismiss the charge of child abuse resulting in death before instructing the jury on the case. We disagree.

{23} First, as argued by the State in opposition to Defendant's motion, the evidence showed that Defendant chose the trailer for the family's residence, picked out the drawer in which Shelby slept, put the items in the drawer with Shelby, was awake with her from 5:00 a.m. until some time in the morning, and discovered her dead in the morning. Testimony concerning Defendant's demeanor the morning Shelby was found dead was also presented at trial. Because direct evidence of abuse is not required to sustain a conviction for child abuse by endangerment, *Graham*, 2005–NMSC–004, ¶ 10, 137 N.M. 197, 109 P.3d 285, we agree that the jury could have drawn reasonable inferences from the above evidence, including the inference that Shelby died as a result of Defendant's actions. We affirm the trial court's denial of Defendant's motion for directed verdict.

{24} Second, Defendant fails to explain how he has been prejudiced by the trial court's denial of his motion, simply contending that allowing the jury to consider the child abuse resulting in death count "injected an intolerable quantum of confusion into the jury's deliberations." A mere assertion of prejudice is not a showing of prejudice. *See In re Ernesto M.*, 1996–NMCA–039, ¶ 10, 121 N.M. 562, 915 P.2d 318. Moreover, this Court has previously held that where a multiplicity of charges were given to the jury, and the jury acquitted on some counts but con-

victed on others, the jury demonstrated that it was not confused and could carefully apply the evidence to each count upon which it had been instructed. *State v. Armijo*, 1997–NMCA–080, ¶ 10, 123 N.M. 690, 944 P.2d 919; *State v. Orgain*, 115 N.M. 123, 125, 847 P.2d 1377, 1379 (Ct.App.1993).

## UJI 14–604

{25} Defendant contends that the UJI given in this case allowed the jury to convict under a civil negligence standard rather than a criminal negligence standard. He focuses on the words "knew or should have known" in the instruction given in this case, which was patterned on UJI 14–604 NMRA. He argues that he could only have properly been found guilty of criminal negligence if the jury determined he had subjective knowledge of the risk of harm, and he contends that objective knowledge, as reflected in the phrase "should have known," cannot support a criminal negligence conviction in New Mexico.

{26} Defendant cannot prevail on this issue under our case law. In *State v. Schoonmaker*, 2008–NMSC–010, ¶¶ 42–45, 143 N.M. 373, 176 P.3d 1105, our Supreme Court rejected the defendant's argument as it pertained to the "should have known" language in UJI 14–602 NMRA, the UJI for child abuse resulting in death. The Court noted that "[w]hat distinguishes civil negligence from criminal negligence is not whether the person is subjectively aware of a risk of harm; rather, it is the magnitude of the risk itself." *Schoonmaker*, 2008–NMSC–010, ¶ 43, 143 N.M. 373, 176 P.3d 1105. UJI 14–602 and 14–604 are materially identical, with the exception that UJI 14–602 includes the additional element that the child abuse must result in death or serious bodily harm. *Compare* UJI 14–602, *with* UJI 14–604. Accordingly, we apply the reasoning and holding of *Schoonmaker* to the case before us, and we reject Defendant's attack on UJI 14–604 on this basis.

## CONCLUSION

{27} We affirm two of Defendant's convictions for child abuse by endangerment, we reverse one conviction for child abuse by endangerment, and we remand to the district court for entry of a new judgment and resentencing consistent with this opinion.

{28} **IT IS SO ORDERED.**

WE CONCUR: JONATHAN B. SUTIN, Chief Judge and JAMES J. WECHSLER, Judge.