This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**STATE OF NEW MEXICO**,

Plaintiff-Appellee,

v.                                                          NO.   27,613

**MOISES TERRAZAS**,

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF OTERO COUNTY**
**James W. Counts, District Judge**

Gary K. King, Attorney General
Nicole Beder, Assistant Attorney General
Santa Fe, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Kathleen T. Baldridge, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**ROBLES, Judge.**

Moises Terrazas (Defendant) appeals his conviction of four counts of child endangerment, contrary to NMSA 1978, Section 30-6-1(D)(1) (2005) (amended 2009). On appeal, he asserts that there was insufficient evidence to sustain a conviction for child endangerment, and that conviction of four counts of the same offense for the same continuous course of conduct violates double jeopardy principles. We partially affirm and partially reverse.

**I. BACKGROUND**

In 2004, Robin Bailey lived in a house in Alamogordo. She had been separated from her husband, Shishmon, for about a year, and the property was in both of their names. In April, Bailey moved to Kansas City, Missouri. She asked a friend to look after the house, but did not give her a key. However, her friend also moved to Kansas City two weeks after Bailey did. Shishmon did not have access to the house at that time.

In September, Bailey returned to the house in Alamogordo and found that people were living there. According to Bailey, the house was in good condition when she left in April but, upon her return, the house was "trashed" and "messed up." She eventually contacted the people who were living there and discovered that the occupants were Defendant, his girlfriend (Etta Sides), and four children ages eight, six, two years, and ten months old. Defendant and Sides are the parents of the two

2

younger children. Bailey testified that Defendant told her that they were living in the house, and they had broken the screens and hinges on the windows because that was the only way they could get in and out of the house. Bailey told Defendant that she wanted to move back into her house and returned five to seven times over the course of the next month, but Defendant and his family did not move out. In mid-October, Bailey called the Children, Youth and Families Department (CYFD) and reported the condition of the house and the children.

Lee Martinez, an employee with CYFD, testified that he and CYFD had received referrals regarding Defendant and his family in the past and had interacted with them before. On October 20, Martinez went to Bailey's house after getting a referral to check on the welfare of the children living there. When Martinez arrived, he met with Sides and the two younger children. A short time later, the two older children returned from school. Martinez took photographs of the residence, which were admitted into evidence. Martinez testified further that he was concerned about the condition of the house and the health and safety of the children. According to Martinez, there was trash, spoiled food, a bicycle against a wall that could fall on a crawling child, dirty clothes, sharp objects, broken windows, no gas, dirty dishes, multiple "trip hazards" on the floor, and an insufficient amount of food in the house. Martinez stated that, when the oldest child came home from school, she recognized him as a CYFD employee, and she began picking up beer bottles from the patio and

taking them behind the house, presumably to a garbage dumpster. Martinez called for police assistance.

Officer Mike Storseth with the Alamogordo Department of Public Safety was dispatched to assist Martinez. The officer testified that, upon his arrival, there were overgrown weeds, a lawn mower, and car parts in the front yard. On the front porch, there were beer bottles, a broken alcohol bottle, a box of beer cans, and ants were "everywhere." The officer also testified that the yard had "[s]tuff that wouldn't make it safe for children to be playing around." Upon entering the house, the officer stated hat the house was dirty and cluttered, and there was "an overwhelming sense of . . . a stink in the air from old food, dirty diapers, just overall being dirty." The officer described a pot "on the counter that had a little bit of . . . [n]oodles in it[] and liquid, more like it was water that they'd cooked the noodles in this electric . . . cooker. It had been there for a while. . . . It was dried up, but there still was some moisture in it indicating to me that recently within the last day or so there [were] people in there that had eaten from that [pot]." The officer further stated that there were "piles of dirty dishes [and] that . . . some of them had been sitting there for a long time. There [were] beer cans [and] beer bottles throughout the kitchen." Broken glass had been swept into a pile in the kitchen, and more broken glass was inside a pitcher. There was trash along the baseboard of the kitchen, no heat or hot water in the house, multiple stains on the carpet, trash, dirty diapers and clothes on the floor

4

in the bedrooms, and a child's car seat and more dirty clothes in the living room. The officer stated that the clothes were piled up so high in one of the bedrooms that he could only get the door open halfway. After seeing the residence, the officer was concerned for the health and safety of the children.

Officer Storseth left the house after ninety minutes. In an attempt to contact Defendant, the officer went to Defendant's mother's house. Although unable to locate Defendant, the officer noticed, on the front porch, a black hibachi-type grill with yellow paint splattered on it that was the same color of splattered paint he had observed at Bailey's house in the living room on the television and entertainment center.

The next day, October 21, 2004, while driving to Bailey's house, in a further attempt to locate Defendant, Officer Storseth passed a vehicle driven by Sides in which Defendant was in the passenger seat, and the four children were in the back. The officer testified that after pulling the vehicle over, the officer noticed that the children were not in car seats or wearing seat belts. The officer then contacted his sergeant to have him contact Martinez, who arrived on the scene and took the children "for placement." Martinez testified that when he arrived to take custody of the children, Defendant told him that the family was living at Bailey's house.

**II.   DISCUSSION**

5

Defendant disputes that a rational jury could have found, beyond a reasonable doubt, the essential facts required to support a conviction of four counts of child endangerment. Defendant argues that three counts of child endangerment should be vacated because all four counts are based on unitary conduct and, allowing them to stand, would violate federal and state constitutional protections against double jeopardy. We address each issue in turn.

**A.      Child Endangerment**

Under our standard of review, if reasonable minds could differ on whether Defendant's acts placed the children in a situation whereby a reasonable probability existed that their health or lives would be endangered, the reviewing court will defer to the factfinder all conflicts in evidence and weight accorded to the testimony of witnesses. *State v. Ungarten*, 115 N.M. 607, 610, 856 P.2d 569, 572 (Ct. App. 1993). "We view the evidence as a whole and indulge all reasonable inferences in favor of the jury's verdict." *State v. Graham*, 2005-NMSC-004, ¶ 13, 137 N.M. 197, 109 P.3d 285. We shall not "substitute our judgment for that of the factfinder concerning the credibility of witnesses or the weight to be given their testimony." *Id.* ¶ 11 (internal quotation marks and citation omitted). An appellate court will only reject testimony believed by a factfinder "if there is a physical impossibility that the statements are true[,] or the falsity of the statement is apparent without resort to inferences or deductions." *Id.* (internal quotation marks and citation omitted). "Contrary evidence

6

supporting acquittal does not provide a basis for reversal because the jury is free to reject [a d]efendant's version of the facts." *State v. Chavez*, 2008-NMCA-126, ¶ 8, 145 N.M. 11, 193 P.3d 558 (alteration in original) (internal quotation marks and citation omitted), *rev'd on other grounds*, 2009-NMSC-035, ___ N.M. ___, ___ P.3d ___ (No. 31,202, June 23, 2009).

To the extent that we must interpret our criminal child endangerment statute, that presents a question of law, which is reviewed de novo. *See State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 24, 137 N.M. 687, 114 P.3d 367. Statutes defining criminal conduct are strictly construed. *Santillanes v. State*, 115 N.M. 215, 221, 849 P.2d 358, 364 (1993). "A criminal statute may not be applied beyond its intended scope, and it is a fundamental rule of constitutional law that crimes must be defined with appropriate definiteness." *Id.*

To be convicted, the jury must find the defendant guilty beyond a reasonable doubt of every essential element. *See State v. Guzman*, 2004-NMCA-097, ¶ 16, 136 N.M. 253, 96 P.3d 1173. Section 30-6-1(D)(1) states, in pertinent part, that "[a]buse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may

7

endanger the child's life or health." The jury was instructed on two different theories of child endangerment: permitted and caused. *See* UJI 14-604 NMRA; UJI 14-605 NMRA. To convict under the theory of caused child abuse (endangerment without great bodily harm or death), the State was required to prove beyond a reasonable doubt that (1) Defendant caused the children to be placed in a situation which endangered their life or health; (2) Defendant acted intentionally or with reckless disregard, meaning that he knew, or should have known, that his conduct created a substantial and foreseeable risk, and he disregarded that risk and was wholly indifferent to the consequences of the conduct and to the welfare and safety of the children; (3) the children were under the age of eighteen; and (4) the conduct took place on or between October 20 and 21, 2004 in New Mexico. UJI 14-604. To convict under the theory of permitting child abuse (endangerment without great bodily harm or death), the State would have had to prove that (1) Defendant permitted the children to be placed in a situation which endangered their lives or health; (2) Defendant acted intentionally or with reckless disregard, meaning that he knew, or should have known, his conduct created a substantial and foreseeable risk, and he disregarded that risk and was wholly indifferent to the consequences of the conduct and to the welfare and safety of the children; (3) Defendant was a parent, guardian, or custodian of the children, or that he had accepted responsibility for the children's welfare; (4) the children were under the age of eighteen; and (5) the conduct took

8

place on or between October 20 and 21, 2004 in New Mexico. UJI 14-605. It is unclear from the verdict forms under which theory Defendant was convicted. However, we conclude that the evidence was sufficient to convict under either theory.

A jury could conclude that Defendant knew, or should have known, of the dangers of allowing the children to be in that environment. Most convincing of that knowledge was Defendant's agreement with the testimony of the State's witness that the house was not "a safe, healthy condition for children to be living in[.]" Defendant admits that he was arguably "put on notice" by earlier CYFD referrals/interactions. Defendant maintains, however, that the house in question was not his, and that there was "no evidence that any member of the family spent the night at the home in question." We assume that Defendant's argument is that there was no proof that the family spent the night at the house on October 20 and 21, 2004. First, Section 30-6-1(D)(1) does not require ownership in title of property for a conviction. Second, Defendant stated that he and the children stayed the night there on at least three occasions. That admission, combined with other evidence, could lead a jury to conclude that Defendant and the children were there on the nights in question. Moreover, the statute does not require that Defendant and the children spend the night in a hazardous environment in order for the children to be "placed in a situation that may endanger the child[ren]'s [lives] or health." Section 30-6-1(D)(1).

9

While we decline to rule on how much time is necessary to expose a child to a hazardous environment before a conviction under Section 30-6-1(D)(1) will be sustained, we note that New Mexico courts have held in the past that the placement of a child in the direct line of physical danger can happen quickly. *See Ungarten*, 115 N.M. at 608, 856 P.2d at 570 (upholding conviction where knife wielded by the defendant came close to the child's body); *see also State v. McGruder*, 1997-NMSC-023, ¶¶ 37-38, 123 N.M. 302, 940 P.2d 150 (upholding conviction where the defendant aimed a gun at, and threatened to shoot, the child's mother when the child was behind the mother, putting the child in a direct line of physical danger); *Chavez*, 2009-NMSC-035, ¶ 36 (holding that the length of time that conditions are allowed to exist is a factor that can increase or mitigate the degree of risk involved). Defendant testified that he told Bailey they were living there because that was what he wanted her to think. He testified that he had been there on at least four occasions when she came by, that he went there occasionally to check on the house, and that he guessed that Sides was probably going there in the middle of the day "to get away," presumably with the two younger children. Officer Storseth testified that while he was en route to the house on October 21, 2004, he encountered the family driving in the opposite direction. Martinez and Bailey testified that Defendant had told them that he and his family were living there. The circumstantial evidence was that someone had cooked there recently, left diapers there, and the two older children came to that

house after school, all lending credence to the inference that Defendant and the children were living there or, at the very least, spending ample time at the house and were there on the days in question. *See Graham*, 2005-NMSC-004, ¶¶ 10, 14 (holding that reasonable inferences can be drawn from direct and circumstantial evidence). Although Defendant disputes that they were living there, a rational jury could have concluded that the family was indeed staying there. "In reviewing the sufficiency of evidence used to support a conviction, we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (filed 1998). Whether Defendant and the children were sleeping at the house misses the point of whether the children were endangered by being in that environment on the days in question.

Defendant also claims that there was no evidence that any of the children were left unattended around any of the dangers in the house. The State argues that one of the children was observed picking up beer bottles unattended when she came home from school. Even if the children were supervised, they could still be injured easily and quickly by any of the hazards in the house. A jury could reasonably infer that the children were endangered in that environment and were more endangered the longer they were exposed to the conditions, regardless of a specific showing of the children being unattended and having their lives, health, or safety jeopardized. *See id.*; *see also*

*Chavez*, 2009-NMSC-035, ¶ 36 (holding that the amount of supervision in a home is a factor that can increase or mitigate the degree of risk involved). "A reviewing court may neither reweigh the evidence nor substitute its judgment for that of the jury." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988).

Citing to *State v. Jensen*, 2006-NMSC-045, ¶ 14, 140 N.M. 416, 143 P.3d 178, Defendant contends that "[w]hen filthy living conditions provide the exclusive basis for charging a defendant with child endangerment, the [s]tate must assist the trier of fact with evidence that supports a finding that there is a reasonable probability or possibility that such filthy conditions endangered the child." Defendant argues that the State never connected any harm, or risk of harm, to the children from the conditions of the home. Defendant argues that, unlike *Jensen*, the State introduced no evidence upon which a rational jury could have found that his conduct posed a risk of harm.

We initially note that in light of *Chavez*, which was decided while this case was on appeal, the standard has now become a "*substantial and foreseeable risk*" that filthy conditions endanger a child. 2009-NMSC-035, ¶¶ 21-22, 31 (internal quotation marks and citation omitted). We make two observations. First, this case is not exclusively about filthy living conditions. Officer Storseth testified that when he encountered the family on October 21, 2004, the four children were in the back seat of a vehicle and were not wearing seat belts. In *Chavez*, our Supreme Court noted that

12

an endangerment charge premised on a combination of risks, including filthy living conditions and criminal acts, can have a cumulative effect. *Id.* ¶ 30. "Where a defendant's underlying conduct violates a separate criminal statute, such legislative declaration of harm may be useful, though not dispositive, to an endangerment analysis when the Legislature has defined the act as a threat to public health, safety, and welfare." *Id.* ¶ 25; *see* NMSA 1978, § 66-7-369(A) (2001) (amended 2005) ("A person shall not operate a passenger car, van or pickup truck in this state . . . unless all passengers less than eighteen years of age are properly restrained."); *see also Graham*, 2005-NMSC-004, ¶ 12 (noting that the Legislature's designation of marijuana as a Schedule I controlled substance and increased penalties for distributing marijuana to minors or in the vicinity of schools, all illustrate a legislative determination that marijuana is a dangerous substance, particularly for minors).

Second, the jury did hear testimony that assisted them in determining whether there was a substantial and foreseeable threat of serious injury. *See Chavez*, 2009-NMSC-035, ¶ 35. Martinez testified that he had concerns for the health and safety of the children based on what he observed at the house. He specifically noted that his concern was based on the trash in the house, the spoiled food, a bicycle that was precariously placed against a wall that could fall on a crawling child, lack of food in the house, five bags of garbage or other debris that could cause "trip hazards," barbeque grills, sharp objects, and broken windows. Officer Storseth testified that the

13

yard was not a safe place for a child to play, that it did not appear that there was enough food in the house for the children to eat, and that there was no hot water or heat. Additionally, the State argues that harm from other dangers were apparent and required no explanation. We agree. No explanation about how broken glass on the floor could hurt a young, crawling child would need to be explained to a jury. *See id.* ¶ 24 (discussing endangerment cases where the seriousness of the threatened injury is apparent); *Dull v. Tellez*, 83 N.M. 126, 128, 489 P.2d 406, 408 (Ct. App. 1971) (defining a reasonable inference as "a rational and logical deduction from facts admitted or established by the evidence, when such facts are viewed in light of common knowledge or common experience").

This Court is unpersuaded by Defendant's assertion that the verdicts were based on the speculation of potential harm. Citing to *State v. Massengill*, 2003-NMCA-024, ¶¶ 43-48, 133 N.M. 263, 62 P.3d 354 (filed 2002), Defendant argues that his conduct was not intended to be covered by the child abuse statute. Defendant's argument is that parents with unsanitary and unsafe homes should not be convicted of a third-degree felony because there is recourse for the State under the civil code. Further, Defendant argues that his conduct did not rise to the level of criminal liability. We conclude that reliance on *Massengill* in this context is misplaced.

*Massengill* concerned a baby stroller that fell off a sidewalk and tipped over, an accidental situation far different from the situation here. *See id.* ¶ 44. In *Chavez*,

14

our Supreme Court discussed the difference between civil and criminal laws that address child abuse. 2009-NMSC-035, ¶¶ 12-26. That opinion clearly held that filthy living conditions alone may, in some circumstances, rise to the level of being criminal in nature. *Id.* ¶¶ 27, 31, 40. "Child abuse by endangerment, as opposed to physical abuse of a child, is a special classification designed to address situations where an accused's conduct exposes a child to a significant risk of harm, even though the child does not suffer a physical injury." *Id.* ¶ 15 (emphasis omitted) (internal quotation marks and citation omitted). "[T]here are several factors the factfinder may consider to determine whether the risk created by an accused's conduct is substantial and foreseeable." *Id.* ¶ 23. Not every risk of injury will rise to the level of felony child endangerment. *Id.* ¶ 35. However, a child's particular susceptibility to a harm is a factor that a jury can consider in determining if child abuse has occurred. *Id.* The State is required to establish that the risks of the home in question are "far greater than those in the average home." *Id.*

Our Supreme Court noted that evidence of past civil actions can put a defendant on notice of the potential for criminal prosecution. *Id.* ¶ 42. In the immediate case, Martinez testified that as an investigator for CYFD, he was aware of four referrals regarding Defendant and his family living in other residences in Alamogordo. Martinez testified that, following the first referral, he met with Defendant and Sides, and they were declining services. Following the second referral, Martinez gave

Defendant his card, presumably to assist Defendant in getting services for his family, but Defendant never contacted him. After the third referral, the determination was made to provide the family with in-home services, which focused on assisting the family in getting utilities and concentrated on issues such as housekeeping, basic child care, nutrition, cleanliness, parental responsibilities, and the security needs of the children. Martinez testified further that there was a fourth referral that he was aware of on which he was not the assigned caseworker/investigator. There is no need for the State to exhaust all of its civil remedies before turning to a criminal sanction. *Id.* ¶ 43. The State did have meaningful interaction with Defendant concerning the care of the children.

We underscore that, in this case, the jury heard testimony about Defendant being in a vehicle with the children unrestrained in the back seat on October 21, 2004, as well as testimony about the house in question. Defendant engaged in a per se unlawful act that bolsters his endangerment charges. *Id.* ¶ 31. Evidence was presented to the jury about the incident in the vehicle, the living conditions, and the past interactions with CYFD. The jury convicted Defendant of criminal child endangerment and, under this Court's standard of review, we will not reweigh the evidence.

**B.      Unit of Prosecution**

This Court holds that Defendant was involved in one continuous act of indifference and endangerment of the children and, accordingly, we vacate three counts of child endangerment. In a very similar case, this Court held that a father that had been convicted on multiple counts due to the living conditions of multiple children should have been convicted on only one count on the premise that the crime was a singular, continuous course of conduct. *Chavez*, 2008-NMCA-126, ¶¶ 17-21. Similarly, the conduct here is not sufficiently separated in time and space to warrant separate convictions.

When an accused is charged with multiple violations of a statute and raises a double jeopardy challenge, we must determine whether the intent of the Legislature was to permit multiple charges and punishments under the circumstances of the case. *Id.* ¶ 18. Section 30-6-1 does not define the unit of prosecution, so this Court must determine whether the "different offenses are separated by sufficient indicia of distinctness." *State v. Castañeda*, 2001-NMCA-052, ¶ 13, 130 N.M. 679, 30 P.3d 368 (internal quotation marks and citation omitted). "[S]ingle-statute[,] unit-of-prosecution issues should be decided on a case-by-case basis." *Id.* ¶ 15.

The State concedes that Defendant's convictions were "premised on a singular, albeit continuous, course of conduct that amounts to child abuse by endangerment." The State agrees that under *Castañeda* and *Chavez*, Defendant's conduct with regard to the four children constituted only one count of child abuse by endangerment. We

17

accept the State's constrained concession and decline to reconsider *Castañeda* and *Chavez.*

**III.    CONCLUSION**

We affirm one conviction under Section 30-6-1(D)(1) and remand with instructions to the district court to vacate the remaining three convictions under that statute and for appropriate sentencing.

**IT IS SO ORDERED.**

_____
**ROBERT E. ROBLES, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**JONATHAN B. SUTIN, Judge**